**BIETER COMPANY, Plaintiff,**

v.

**BEATTA BLOMQUIST;** City of Eagan; Federal Land Company; Eagan Tower Office Building Partnership; Eagan Heights Commercial Park; Advance Developers, Inc.; Cliff Road Properties; Hoffman Development Group, Inc.; HDG Associates Limited Partnership; Eagan Associates Limited Partnership; CRP of Eagan, Inc.; Robert L. Hoffman; Patrick C. Hoffman; and Jack F. Daly, Jr., Defendants.

**CLIFF ROAD PROPERTIES;** Hoffman Development Group, Inc.; Advance Developers, Inc.; HDG Associates Limited Partnership; Eagan Associates Limited Partnership; CRP of Eagan, Inc.; Robert L. Hoffman; Patrick C. Hoffman; and Jack F. Daly, Jr., Third–Party Plaintiffs,

v.

**DORSEY & WHITNEY,** a Minnesota partnership; and Ryan Construction Company of Minnesota, Inc., a Minnesota corporation, Third–Party Defendants.

No. 3–89 CIV 759.

United States District Court, D. Minnesota, Third Division.

Feb. 18, 1992.

See also 132 F.R.D. 220.

Lindquist & Vennum by R. Walter Bachman, Jr., and James McCarthy, Minneapolis, Minn., for plaintiff.

Hoff & Allen by George C. Hoff, and Thomas G. Barry, Jr., Minneapolis, Minn., for defendant Beatta Blomquist.

Best & Flanagan by Robert R. Barth and Cindy J. Larson, Minneapolis, Minn., for defendant Federal Land Co.

Fruth & Anthony by Joseph W. Anthony and Norman J. Baer, Minneapolis, Minn., for defendants Advance Developers, Inc., Cliff Road Properties and Hoffman Development Group, Inc.

Fabyanske, Svoboda, Westra & Davis by Gerald L. Svoboda, St. Paul, Minn., for third-party defendant Dorsey & Whitney.

Fredrikson & Byron by Thomas S. Fraser, and Todd A. Wind, Minneapolis, Minn., for third-party defendant Ryan Const. Co. of Minnesota, Inc.

## ORDER

ALSOP, Chief Judge.

The above entitled matter came on for hearing before this court on December 20, 1991 upon the motions of all defendants for summary judgment on plaintiff's complaint, and upon the motions of all third-party defendants for summary judgment on the third-party complaint. For the reasons set forth below, defendants' motions for summary judgment will be granted, and plaintiff's complaint will be dismissed.

## I. FACTUAL BACKGROUND [1]

### A. *The Parties*

This case arises out of intense competition between commercial developers of real estate in Eagan, Minnesota. Plaintiff Bieter Company ("Bieter") is a Minnesota partnership which owns land at the northeast quadrant of the intersection of Interstate Highway 35E and Diffley Road. When Bieter acquired this land in 1978 it was zoned for agricultural use. In 1983, the City amended its Comprehensive Land Use Guide Plan and designated the Bieter property to be D–II (mixed residential, 3–6 units per acre). Bieter desires to develop this property as a regional shopping center but has never obtained the necessary rezoning.

---

1. Like many RICO cases, this case is factually complex. In this order, the court will recite only those facts necessary to an understanding of the case and resolution of the motions now before it.

Federal Land Company, Eagan Tower Office Building Partnership, and Eagan Heights Commercial Park (collectively referred to as "Federal") are commercial real estate developers which own or control substantial portions of commercially zoned real estate in the City of Eagan, including two shopping centers a short distance to the north of the Bieter property, known as Yankee Square Center and Town Centre.

Advance Developers, Inc., Cliff Road Properties, Hoffman Development Group, Inc., HDG Associates Limited Partnership, Eagan Associates Limited Partnership, CRP of Eagan, Inc., Robert L. Hoffman, Patrick C. Hoffman, and Jack F. Daly, Jr. ("the Hoffman defendants") controlled and participated in the development of the property located at the northwest quadrant of the intersection of Interstate 35E and Cliff Road, a relatively short distance from the 35E–Diffley Road intersection. Currently located on this property is a shopping center known as "Cliff Lake Centre," whose anchor tenants are Target Stores and Cub Foods.

The final defendant is Beatta Blomquist. Blomquist was the mayor of the City of Eagan through December 31, 1987. In the time period relevant to this lawsuit, Blomquist was also the majority shareholder and officer of McBlom Enterprises, Inc., now known as Video Hollywood Style of Eagan, Inc., which operated video and photo stores in the City of Eagan.

The third-party defendants in this case are Dorsey & Whitney and Ryan Construction Company ("Ryan"). The Hoffman defendants assert claims for contribution and indemnity against these third-party defendants based upon their role in the development of Cliff Lake Centre, and specifically in their role in obtaining Target as an anchor tenant.

### B. The Bieter Proposal

Bieter began making its plans for a regional shopping center known in 1986. Bieter formally announced its proposed development in September 1986 and in October 1986 formally filed applications with the City to seek amendment of the Compre-hensive Guide Plan, rezoning of the Bieter property and preliminary plat approval for the center. At the time of its proposal, Bieter had solicited major tenants for the shopping center, including Northwest Racquet & Swim Club and Cub Foods, and had the commitment of Target Stores to be an anchor tenant.

Bieter proposed an ambitious development, involving four large anchor tenant stores, costing in the range of 50 million dollars, and requiring the rezoning of about 90 acres of land. Not surprisingly, the Bieter proposal met with opposition from both Federal and the Hoffman defendants, competing developers in Eagan. The defendants' opposition included writing letters to the Eagan City Council stating their opposition to any amendment in the Comprehensive Guide Plan, which was a prerequisite to the development of the Bieter property. In addition to speaking out against the Bieter proposal, the Hoffman defendants in January 1987 announced plans for a shopping center of their own on their property at 35E and Cliff Road. As will be discussed shortly, plaintiff alleges the defendants opposed the Bieter proposal through illegal as well as legal means.

The first public hearing on the Bieter proposal was held on November 25, 1986 before the Eagan Advisory Planning Commission ("APC"). After extensive discussion, the hearing was continued until the January 1987 APC meeting to allow further study. The Bieter proposal came once again before the APC on January 27, 1987. Presentations were made by the City staff and by Bieter representatives. Members of the public spoke both in support of and against the Bieter proposal. The APC decided by a 6–1 vote to recommend denial of Bieter's application. Dave Gustafson was the only APC member to cast a dissenting vote.

The Bieter proposal came before the Eagan City Council on February 3, 1987. The City Council at the time consisted of Mayor Blomquist, Thomas Egan, James Smith, Theodore Wachter, and Victor Ellison. The Council heard from the City staff, the Bieter representatives, and members of the

public. The Council decided by a 4–1 vote to deny Bieter's applications for rezoning and a change in the Comprehensive Guide Plan. Bieter's proposal therefore failed. The only vote in favor (in support) of Bieter's applications was by Councilmember Ellison.

Bieter responded to the City Council's rejection of its proposal by filing a lawsuit in March 1987 in Dakota County District Court, claiming the City's denial was unreasonable, arbitrary and capricious, and that the City had "denied plaintiff all reasonable uses of its land." Some discovery was undertaken in that action, including the depositions of the City Council members. However, that lawsuit has been dormant since the summer of 1988.

### C. *Approval of Cliff Lake Centre*

After the rejection of the Bieter proposal, the Hoffman defendants, in cooperation with third-party defendant Ryan Construction Company, began pressing their proposed development at 35E and Cliff Road. On June 19, 1987 Target announced that it had committed to be an anchor tenant in the 35E and Cliff Road development, then labeled "Cliff Lake Galleria." Hoffman Development Group and Ryan Construction jointly filed a preliminary plat for the development in July 1987.

The issue of whether and where to build a new regional shopping center in Eagan became a key issue in the November 1987 elections. Ellison, who strongly opposed the proposed Cliff Lake development, defeated Blomquist in the mayoral race. Gustafson, the only APC member to vote in favor of the Bieter proposal, also won a seat on the City Council. The balance of the 1988 City Council would include Egan, Wachter, and Pam McCrea, a former APC member who was appointed to the Council by Ellison. Of course, the new mayor and Council would not take office until January 1988.

On November 5, 1987, the first City Council meeting after the election, the Hoffman defendants' "Cliff Lake Galleria" proposal came before the City Council. The APC had recommended denial of this proposal in October 1987. In the course of their presentation, the Hoffman defendants introduced a revised development plan consisting of a substantially scaled-back version of the shopping center. At the conclusion of the hearing, the City Council voted to refer this new proposal to the APC so that the City Council could act upon the proposal at its meeting on December 1, 1987. At the December 1, 1987 City Council meeting, the City Council approved the new Cliff Lake preliminary plat proposal by a 3–2 vote with Blomquist, Egan and Smith voting in favor, and Ellison and Wachter against. The City Council's approval of the preliminary plat was expressly contingent upon the developers meeting more than 20 conditions.

In late December 1987 Target advised Bieter in writing that it was no longer interested in pursuing opportunities with Bieter in Eagan.

The 1988 Eagan City Council, of which Blomquist was not a member, took a series of actions necessary for the Cliff Lake development (which had become known as "Cliff Lake Centre") to become a reality, including approval of a revised preliminary plat for Cliff Lake Centre on March 1, 1988. As the 1988 City Council moved forward on the Cliff Lake Centre development, Bieter never reapplied for approval of its proposal nor did it submit any revised proposal to the 1988 City Council. The only efforts Bieter pursued to obtain rezoning of its property consisted of settlement proposals in connection with its state court lawsuit against the City. In February 1988 and again in April 1988, Bieter offered to settle its lawsuit if the City would, without pursuing the customary application and public hearing process, grant rezoning, and approve a preliminary plat proposal for the Bieter property. The City refused to take action on the Bieter property absent a formal application on the part of Bieter. Despite the fact that Mayor Ellison repeatedly encouraged the principals of Bieter Company to reapply through the normal channels, Bieter declined to do so.

### D. *The RICO Allegations*

Allegations of RICO violations were conspicuously absent from plaintiff's original complaint in this case. Plaintiff's original complaint alleged violations of state and federal antitrust laws and asserted state law tort claims. After the United States Supreme Court decision in *City of Columbia v. Omni Outdoor Advertising, Inc.*, —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), plaintiff sought and was granted leave to amend its complaint to delete the antitrust claims and add two RICO counts. Count I of the Third Amended Complaint alleges violations of 18 U.S.C. § 1962(c), participation in the affairs of an enterprise through a pattern of racketeering activity; and Count II alleges violation of 18 U.S.C. § 1962(d), conspiracy to violate section 1962. Count III asserts a state law claim for intentional interference with business relations.

In short, Bieter claims that Federal, the Hoffman defendants, and Blomquist conspired with each other to prevent Bieter from developing a shopping center on its property. Bieter claims the defendants carried out that conspiracy through a pattern of racketeering activity, including bribes of Mayor Blomquist and two other Council members to vote against the Bieter proposal on February 3, 1987, and in favor of the Cliff Lake Centre proposal on December 1, 1987. Bieter seeks damages in excess of ten million dollars for loss of future profits "which would have been realized in the development, rental, and operation of the 35E/Diffley Center." Complaint, ¶ 121.

■ Because of the court's resolution of the instant motions, it is unnecessary to recite in detail the evidence relating to plaintiff's allegations of conspiracy and various predicate acts in furtherance of the conspiracy.[2] It suffices to say that the evidence is sufficient to raise a genuine issue of fact as to whether Federal bribed Blomquist by providing her with favorable rental treatment in connection with her video rental and photo stores in Federal's Yan-

kee Square Center and Town Centre. Plaintiff presents evidence that beginning in late 1984 Federal gave Blomquist's video rental business space in its Yankee Square Center for substantially below-market value rates. Even after the original lease period expired, the favorable lease terms were extended monthly through 1986 and into 1987. In March, 1986 Blomquist's business located a video and photo store in Federal's Town Centre. Bieter does not claim that the rental rate itself in that lease constituted a bribe. However, in February 1987, the month in which Bieter's proposal appeared before the City Council, past-due rent of approximately $7,800 was written-off, and thus forgiven, by Federal on Blomquist's store. From 1985 through 1987, Blomquist consistently voted in accordance with Federal's interests.

■ The evidence is also sufficient to raise a genuine issue of fact as to whether the Hoffman defendants bribed Blomquist to vote in favor of the Cliff Lake development by creating sham political committees through which the Hoffmans funneled almost $5,000 to support Blomquist in her November 1987 election campaign. There is also evidence that the Hoffmans bribed Blomquist through oral promises of an option to lease space at Cliff Lake Centre prior to the December 1, 1987 vote.

Plaintiff has produced evidence of several additional predicate acts of the Hoffman defendants in connection with the sham political committees and subsequent efforts to conceal their true nature and source of funding. These acts include bribery and witness tampering involving Joel Pearson, one of two persons the Hoffmans paid to act as a "front" for their political committees. Pearson has testified by deposition that he was coached to lie to authorities in connection with a 1987 criminal investigation and to lie in depositions taken in this lawsuit, and that he was promised payment for his "cooperation" in the form of lucrative real estate listings (Pearson is a real estate agent) and forgiveness of rent. The

---

**2.** Because it is unnecessary in order to resolve the instant motions, the court will make no finding as to the sufficiency of the evidence supporting the conspiracy allegations.

Hoffmans also provided Pearson with counsel at his depositions, free of charge.

In its response to defendants' motions, plaintiff has alleged for the first time that Federal bribed not only Blomquist but also Councilmembers Smith and Wachter in connection with the Bieter proposal. Plaintiff alleges that Federal bribed Smith by offering him a free fishing trip to Canada and that Federal bribed Wachter by providing him some subcontracts for construction work. The evidence relating to these allegations, which is not sufficient to raise a genuine issue of fact, will be described in detail in the following discussion.

## II. DISCUSSION

### A. *Summary Judgment Standard*

The Supreme Court has held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses which are either factually unsupported or which are based on undisputed facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hegg v. United States,* 817 F.2d 1328, 1331 (8th Cir.1987). Summary judgment is proper, however, only if examination of the evidence in a light most favorable to the non-moving party reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The test for whether there is a genuine issue over a material fact is two-fold. First, the materiality of a fact is determined from the substantive law governing the claim. Only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512; *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987). Second, any dispute over material fact must be "genuine." A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a

verdict for either party. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. It is the non-moving party's burden to demonstrate that there is evidence to support each essential element of his claim. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

### B. *RICO Counts*

### 1. RICO Standing

To maintain a civil action under RICO, a plaintiff must have been "injured in its business or property by reason of a violation of 18 U.S.C. § 1962." 18 U.S.C. § 1964(c). This language requires a plaintiff to satisfy two requirements: (1) plaintiff must suffer a cognizable injury to his "business or property;" and (2) the injury must have been caused by at least one of the predicate acts sufficiently related to constitute a violation of section 1962.[3] *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

With respect to the causation requirement, the Supreme Court has of course rejected attempts at imposing a special "racketeering injury" requirement on civil RICO plaintiffs. *Sedima,* 473 U.S. at 498, 105 S.Ct. at 3286. Nevertheless, a RICO plaintiff must satisfy ordinary tort principles of causation. As the Fourth Circuit stated in *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988):

> Civil RICO is, of course, a statutory tort remedy—simply one with particularly drastic remedies. Causation principles generally applicable to tort liability must be considered applicable. These require not only cause-in-fact, but 'legal' or 'proximate' cause as well, the latter involving a policy rather than a purely factual determination: 'whether the conduct has been so significant and important to cause that the defendant should be held responsible.' Prosser & Keeton *Torts,* § 42, page 272 (General Principle) (5th Ed.1984).

---

**3.** For the sake of brevity, the court will refer to the "predicate acts sufficiently related to constitute a violation" as "defendants' conduct."

859 F.2d at 1189. *See also Hecht v. Commerce Clearinghouse, Inc.,* 897 F.2d 21, 23 (2d Cir.1990).[4]

### 2. Application of Standing Requirements

■ Applying the requirements of injury and causation in the instant case, the court concludes that the evidence is insufficient to establish that plaintiff has suffered injury proximately caused by defendants' conduct.[5] Plaintiff contends that defendants corrupted two decisions of the City Council: the February 3, 1987 rejection of the Bieter proposal and the December 1, 1987 approval of the Cliff Lake Centre development. Plaintiff argues that both of those decisions of the Council caused it injury by depriving plaintiff the rezoning of its property, thereby depriving plaintiff of the opportunity to develop a shopping center on its property. As to the February 3 decision, the court concludes that no reasonable jury could find that defendants' conduct was cause in fact of the defeat of the plaintiff's proposal. Thus, defendants' conduct relating to that decision did not proximately cause injury to plaintiff.

With respect to the December 1 decision, the court concludes plaintiff has not suffered a cognizable injury due to that decision because plaintiff's failure to apply for rezoning after the decision renders any claim of injury too speculative to allow recovery of damages.

#### a. *The February 3, 1987 City Council Vote*

Under state law, a two-thirds vote of the City Council is required to approve a rezoning and to amend the Comprehensive Guide Plan. *Minn.Stat.* § 462.357, subd. 2. Bieter therefore needed 4 of the 5 Councilmembers to vote in favor of its applications in order for them to be approved. Plaintiff's applications were denied by a vote of 4–1. This court has concluded that plaintiff has produced sufficient evidence to raise a genuine issue of fact as to whether Blomquist's vote was induced by bribery. However, Blomquist's vote was not determinative. Any two negative votes would have defeated the Bieter applications. To establish causation, plaintiff must somehow link at least two of the other negative votes to the defendants' conduct. Plaintiff attempts to do this in two ways. First, plaintiff alleges that Federal bribed not only Blomquist, but also Councilmembers Smith and Wachter. Second, plaintiff claims Blomquist so dominated the Council that her opposition effectively doomed the Bieter proposal.

The basis for the allegation of a bribery of Smith is as follows. In his deposition, Smith testified that some time in the fall of 1986 Vern Colon, a principal of Federal, offered to take Smith along on a fishing trip to Canada the following summer. Smith responded, "Oh, sure," but testified that he did not take this offer seriously, saying that he figured "that's the last I would hear of that." Smith Deposition at p. 6. The next Smith heard about the fishing trip was in March or April of 1987, when he received a note from Colon saying that the fishing trip was set for June. Smith then went on the trip, and paid no part of the cost of the trip. Smith testified that he had no conversations about any matter relating to Eagan politics, or any matters relating to development in Eagan, on the fishing trip.

The court concludes that this evidence is insufficient to establish that Smith's vote was procured by bribery. Whatever the intentions of Colon in offering the trip,

---

**4.** In *Terre du Lac Ass'n, Inc. v. Terre du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985), the Eighth Circuit held that a plaintiff may pursue a RICO action even though the plaintiff only alleges that it suffered "indirect" injury. A careful reading of *Terre du Lac,* and the case on which it relies, *Alexander Grant & Co. v. Tiffany Indus., Inc.,* 742 F.2d 408, 411 n. 7 & 8 (8th Cir.1984), makes clear that in reaching this holding, the Eighth Circuit did not intend to eliminate a requirement of proximate cause. The court finds the holdings of the Eighth Circuit in *Terre du Lac* and *Alexander Grant* consistent with a proximate cause requirement.

**5.** Defendants have raised several issues in addition to injury and causation in their briefs, including the existence of a "pattern" and an "enterprise." Because of its resolution of the injury and causation issues, the court declines to reach these issues.

there is no evidence that Smith accepted the offer with the understanding that it would influence his vote. The offer, as described by Smith, was in no way conditional upon any conduct of Smith in his capacity as councilmember. Plaintiff produces no evidence which calls into question Smith's statement indicating he did not take the offer seriously. Moreover, it is unclear that the offer was communicated as a *free* trip. As it turned out, Smith paid nothing. Smith's deposition, however, gives no indication that cost was discussed one way or another prior to the February 3 vote. Nor is there any evidence that Smith's vote was influenced by the offer of the fishing trip. In his deposition in connection with Bieter's state court lawsuit, Smith testified that he was not encouraged to oppose the Bieter application by any of the defendants, and stated that he decided how he was going to vote at the meeting, based upon the merits of the proposal.

The allegations of bribery of Councilmember Wachter are based upon two construction contracts he received from Federal in 1987. In addition to being a councilmember, Wachter was a contractor in the City of Eagan. Wachter performed one project for Federal during the two weeks prior to the February 3, 1987 vote, and was paid for the project after the vote. A second and more substantial project was performed between March and May 1987. Wachter testified that he recalled discussing this second project with Vern Colon at City Hall before a City Council meeting which Vern Colon was attending. This discussion may have occurred the night of February 3, 1987.

The court similarly finds this evidence insufficient to raise a jury issue on bribery of Wachter. Contracting was Wachter's business. Plaintiff presents no evidence that Wachter was paid in excess of the fair market value for his services on these contracts, nor does it present any evidence that Wachter's voting was influenced by these contracts. Like Councilmember Smith, Wachter testified that his vote on the Bieter proposal was not influenced by any of the defendants, and that he made up his own mind about the vote based upon

the merits of the proposal. In addition, Wachter voted against the Cliff Lake proposal on December 1, 1987, a proposal that Federal supported, according to plaintiff. This is a strong indication that the prospect of obtaining contracts from Federal did not determine how Wachter voted as a councilmember.

Setting aside the alleged bribes of Smith and Wachter, plaintiff contends that Blomquist exerted such influence over the Council as a whole that her opposition to the Bieter proposal caused other members of the Council to vote against the proposal. The court finds the evidence insufficient to support a finding of causation on this theory as well. The depositions of Councilmembers Egan, Smith and Wachter were taken in connection with Bieter's state court lawsuit and again in connection with the present lawsuit. All three testified that Blomquist never encouraged them to oppose the Bieter project prior to the February 3, 1987 Council meeting. Each testified that they made their own decision regarding the Bieter proposal, and that they made their decision based upon the merits of the proposal in light of the information available to them at the time of the vote.

Plaintiff attempts to cast doubt on this testimony by pointing to a memorandum from the city administrator and the minutes of a July 31, 1986 workshop session which plaintiff claims show that the Council had decided to reject the Bieter proposal long before February 3. The documents plaintiff refers to are equivocal, at best. They do not establish that the February 3 vote was a sham, nor do they undermine the statements of councilmembers that each made an independent decision.

■ Plaintiff also cites the testimony of Councilmember Ellison, the only Councilmember to vote in favor of the Bieter proposal, who testified in his deposition that "my observations are that most of the projects she [Blomquist] supported were passed and most of the projects she opposed were defeated ... I believe that she and Tom Egan and Jim Smith consistently voted alike. Who's influencing whom, I'm

not sure." Ellison Deposition, Vol. 2, 511–512. The court finds this testimony insufficient to create a jury issue on causation. The fact that Egan and Smith generally voted the same as Blomquist does not establish that Blomquist somehow controlled their votes. Moreover, the record before the court contains at least two specific examples in which Blomquist, Egan, and Smith did not vote in the same manner on zoning issues before the City Council. The first is the zoning application of Federal referred to in the City Council minutes of May 7, 1985 as the Cliff Square rezoning matter. Egan, Smith, and Wachter voted to deny Federal's application, while Blomquist voted against Egan's motion to deny the application. The second example is described in the City Council minutes as the R.J. O'Neil rezoning application, which came before the City Council on July 16, 1985. On that issue, Smith, along with Councilmembers Wachter and Thomas, voted to approve the O'Neil application, while Blomquist and Egan voted against approval.

Plaintiff finally points to evidence of the lobbying efforts of Blomquist, including Blomquist's attempts to persuade Target to choose a different site from the Bieter property for a Target store in Egan. There is no question that Blomquist was opposed to the Bieter proposal from its inception, and that she expressed her views directly to Target. The issue, however, is whether she imposed her views on the other Councilmembers, and whether their votes are attributable to her views and activities. The court finds no evidence that this is the case.

In sum, plaintiff has failed to raise a genuine issue as to whether defendants' conduct caused any councilmember other than Blomquist to vote to deny the Bieter applications. Three other councilmembers voted to deny the applications, and only two negative votes were required to deny the applications. Accordingly, defendants' conduct cannot be regarded as a cause in fact of the denial of those applications.

### b. *Approval of Cliff Lake Centre*

Plaintiff contends that the denial of its applications on February 3, 1987 was not, or should not have been, the fatal blow to its proposed shopping center. Plaintiff argues that the December 1, 1987 approval of Cliff Lake Centre constitutes a separate and independent cause of injury. The City Council approved the Cliff Lake Centre preliminary plat by a vote of 3–2.[6] Blomquist voted in the majority. Because the evidence is sufficient for a jury to conclude that Blomquist was bribed by the Hoffman defendants in connection with this vote, the court concludes that a jury could reasonably conclude that the defendants' conduct caused the approval of Cliff Lake Centre.[7] It does not necessarily follow, however, that this approval proximately caused injury to plaintiff.

The Cliff Lake Centre approval occurred less than a year after plaintiff had been denied rezoning of its property. The approval affected no change in the Comprehensive Guide Plan nor any change in the zoning of the Bieter property. Ronald Cornwell, a principal of Bieter, conceded in his deposition that it would have been possible to develop shopping centers on both the Cliff Lake property and the Bieter property. It would appear, then, that plaintiff was in the same position with respect to the zoning of its property after the approval as before.

Plaintiff's theory of injury seems to be as follows. In light of the makeup of the

---

**6.** No two-thirds majority was needed because the plan did not require any change in zoning.

**7.** Defendants have argued that the December 1, 1987 vote was immaterial because 120 days had passed from the initial filing of Cliff Lake Centre's proposed preliminary plat and, pursuant to state law, the preliminary plat would have been deemed approved unless the Council acted to reject it. *See Minn.Stat.* § 462.358, subd. 3b. The court rejects this argument. The Minnesota statute on which defendants rely applies only to a preliminary plat which is consistent with current zoning and Comprehensive Guide Plan provisions. The original preliminary plat filed by Hoffman Development Group was plainly not in compliance with the current zoning restrictions. Only after the Hoffmans introduced its scaled-back version of Cliff Lake Centre did the proposal come into compliance with the existing zoning.

1988 City Council, plaintiff would have had a good chance of obtaining the rezoning for its shopping center in 1988 absent the approval of Cliff Lake Centre. The approval, according to plaintiff, deprived it of Target as a committed user for the Bieter site. Without Target, plaintiff could attract no committed users. And without committed users, plaintiff claims it had no chance to obtain the necessary rezoning. Plaintiff thus seeks damages for the loss of an opportunity to obtain the zoning changes necessary to the development of a shopping center on its property, even though plaintiff never applied for those changes after the allegedly injurious event.[8]

This court, Judge Harry H. MacLaughlin presiding, faced a similar situation in *Metal Coating Minneapolis v. Minneapolis Community Development Agency, et al.,* Civ. 4–89–415, 1989 WL 296682 (Order dated Nov. 22, 1989). In *Metal Coating,* as in the instant case, the plaintiff sought damages for the loss of an opportunity to obtain a favorable decision from a governmental body. There, the plaintiff sought financing from the MCDA. Although it never formally applied for such financing, the plaintiff sued MCDA and several government officials, contending that allegedly improper conduct and statements of officials had made in impossible for the plaintiff to get the financing. The plaintiff defended its failure to apply by arguing that defendants' conduct had rendered application futile. Judge MacLaughlin dismissed the RICO claim in part because plaintiff had alleged no cognizable injury within the meaning of 18 U.S.C. § 1964(c). The court reasoned in part as follows:

> Plaintiff's claim that the formal application would be 'futile' in view of defendants' stated positions concerning the desirability of providing financing to plaintiff is beside the point. Plaintiff does not state a claim under RICO unless it alleges that it has been deprived of business or property by reason of defendants' conduct. Here, no deprivation occurred because the pertinent state officials were never called upon to determine plaintiff's rights to financing.

*Id.* at 20.

In reaching this conclusion, Judge MacLaughlin found analogous the case of *Williamson Regional Planning v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). There, the Court dismissed as not ripe a developer's claim of an unconstitutional taking based on a county planning commission's rejection of the developer's site plan. The Court refused to consider the claim absent application by the developer for variances which could have allowed development of the property as planned, stating it was "impossible to determine the extent of the loss or interference until the Commission has decided whether it will grant a variance from the application of the regulations." *Id.,* 105 S.Ct. at 3119 n. 12.

In the instant case, it is impossible to determine whether plaintiff has been injured by the approval of Cliff Lake Centre and the extent of any injury absent a decision of the City Council after December 1, 1987 to grant or deny the rezoning of plaintiff's property. The City Council has broad discretion on zoning issues. Any attempt to predict how the Council would have voted on an application had plaintiff submitted one is inherently speculative. Plaintiff's claim of a "lost opportunity" is not the sort of actual, concrete injury necessary to establish a cognizable injury under the RICO Act.

The facts of this case demonstrate the speculative nature of any inquiry into how the 1988 City Council might have acted on an application for rezoning. The membership of the City Council had changed in favor of the plaintiff. Blomquist, plaintiff's staunchest opponent, was replaced by Ellison, an apparent ally of the plaintiff.

---

**8.** It is undisputed that plaintiff never filed a formal application for rezoning and Comprehensive Guide Plan amendment with the City Council after the approval of Cliff Lake Centre. The proposals plaintiff put before the City Council were strictly in the context of settlement negotiations, and cannot be regarded as the equivalent of an actual application for rezoning. The City's refusal to settle the lawsuit on plaintiff's terms is no indication of how the City Council might have acted had plaintiff filed a formal application for rezoning.

Thomas Smith was replaced by Dave Gustafson, the only APC member to vote in favor of the Bieter proposal in January 1987. Despite this favorable composition of the Council, plaintiff contends it had no chance to obtain rezoning without Target because of the City's policy against rezoning without committed users. Plaintiff's position is undermined by repeated invitations by the Council, through Mayor Ellison himself, asking plaintiff to submit a formal application for rezoning even when plaintiff obviously could not get Target and had not formally announced any other committed users. Moreover, plaintiff's claim that it could not attract alternative users is questionable in light of a Bieter representative's statement to the City Council in the course of settlement discussions that "users are not the problem." This representative proceeded to list several potential tenants Bieter believed it could attract.

Viewed in a light most favorable to plaintiff, the evidence is equivocal as to whether an application by plaintiff would or would not have been granted. In light of this, any conclusion as to whether and to what extent plaintiff was injured is speculative.

Plaintiff cannot sustain a RICO action unless it can establish it suffered cognizable injury due to defendants' conduct. With respect to the February 3 denial of plaintiff's applications, plaintiff cannot show that defendants' conduct caused that denial. With respect to the approval of Cliff Lake Centre, plaintiff cannot establish that it suffered actual, and not merely speculative, injury as a result of the approval. Accordingly, plaintiff's RICO claims must be dismissed.

### C. *Intentional Interference with Business Relations*

█ Count III of the Third Amended Complaint asserts a common-law tort claim for intentional interference with business relations. This count has been dismissed with respect to Federal. Because a substantial amount of judicial resources has been expended on this matter and because this claim is closely related to the federal law claims, the court will reach the merits of this claim even though it is dismissing the federal claims.

Under Minnesota law, the elements of this tort are as follows:

1. The existence of a sufficient business relationship;

2. The alleged wrongdoer's knowledge of the business relationship;

3. The intentional interference with the business relationship;

4. Without justification and through improper conduct;

5. Resulting in damages to the plaintiff.

*See Int'l Travel Arrangers v. NWA, Inc.,* 723 F.Supp. 141, 154–55 (D.Minn.1989).

Plaintiff's theory is that the Hoffman defendants and Blomquist improperly interfered with plaintiff's business relationship with Target by luring Target away from the Bieter proposal to the Cliff Lake development, and proceeding to get the Cliff Lake development approved through illegal acts. Without addressing whether the other elements are met, it is clear that the element of damages under this claim fails for the same reason that plaintiff cannot satisfy the RICO injury requirement. Absent a decision of the City Council on rezoning after plaintiff lost Target, plaintiff's claim of damages is too speculative to allow recovery. Count III will therefore be dismissed as well.

### D. *Motions of Third–Party Defendants*

Dismissal of plaintiff's complaint renders the motions of the third-party defendants moot. The motions therefore need not be addressed.

Upon the foregoing, and all the files, records and proceedings herein,

IT IS HEREBY ORDERED That:

1. The motions of all defendants for summary judgment on plaintiff's complaint are GRANTED;

2. Plaintiff's Third Amended Complaint is DISMISSED with prejudice; and

3. The motions of all third-party defendants for summary judgment on the Third–Party Complaint are DENIED as moot.

4. The Clerk of Court shall enter judgment as follows:

IT IS ORDERED, ADJUDGED AND DECREED That plaintiff Bieter Company shall have and take nothing· on its claims and plaintiff's complaint is dismissed in its entirety with prejudice.