**HMK CORPORATION, a Virginia Corporation, Plaintiff-Appellant,**

v.

**John C. WALSEY, et al., Defendants-Appellees.**

**No. 86–3582.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 2, 1987.

Decided Sept. 17, 1987.

George Robert Blakey, Notre Dame, Ind. (Notre Dame Law School, James G. Harrison, Lawrence D. Diehl, Ray P. Lupold, III, Marks, Stokes & Harrison, P.C., Hopewell, Va., on brief) for plaintiff-appellant.

Steven L. Micas, Co. Atty. (Jeffrey L. Mincks, Sr. Asst. Co. Atty., on brief), Charles F. Witthoefft (Michael P. Falzone, Hirschler, Fleischler, Weinberg, Cox & Allen, Edward E. Willey, Jr., Willey & Hall, P.C., James T. Moore, John J. Beall, Jr., Sr. Asst. Attys., Gen., Caroline L. Lockerby, Asst. Atty. Gen., Richmond, Va., on brief) for defendants-appellees.

Before HALL, PHILLIPS and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

HMK Corporation, the plaintiff-appellant in this case, bought property on which it intended to build a large mixed use development. The Boulders Development, controlled by defendant-appellees John C. Walsey, *et al.*, borders HMK's property. HMK alleges that the owners of the Boulders Development misled officials of Chesterfield County, Virginia, and the state Department of Highways and Transportation, thereby subverting the county's planning process. The result of this subversion, according to HMK, is that the defendants

gained a windfall at HMK's expense. Based on these allegations, HMK sued the owners of Boulders under civil RICO, 18 U.S.C. § 1964(c). The district court granted summary judgment to the defendants on several grounds. We do not resolve the problematic grounds addressed by the district court, however, because we hold that HMK has failed to allege a "pattern of racketeering activity" as required by the RICO statute.

## I.

The HMK property and the Boulders property are located in the "Jahnke-Chippenham Development Area" of Chesterfield County. This area is bounded on the east by Chippenham Parkway, on the north by the Southern Railway, on the south by Midlothian Turnpike and the Beaufont Mall shopping center, and on the west by residences. Both developers proposed to develop their properties for a number of purposes, including office space, retail stores, apartments, and hotels. The County approved both the HMK and the Boulders development proposals with some modifications and conditions.

This is the eighth lawsuit in which HMK challenges the legality of decisions made by Chesterfield County affecting HMK's property and the adjacent Boulders property. In addition to six lawsuits in state court, HMK has earlier sued in federal district court. *HMK Corp. v. County of Chesterfield*, 616 F.Supp. 667 (E.D.Va. 1985). In the present lawsuit, HMK alleges that the defendants and their co-conspirators defrauded the state and local government into granting the Boulders Development numerous benefits and saddling HMK with numerous burdens. These governmental decisions applied mainly to zoning and the related issues of condemnation and highway placement.

In their complaint and its appendices, appellants detail activities on the part of Boulders that allegedly constitute Boulders' scheme to defraud. Appellants contend that this fraudulent scheme consisted of several episodes of racketeering. These episodes span a period of four years. They include a series of misrepresentations, false statements, half-truths, and omissions to neighborhood residents, the county planning board, the Virginia Department of Highways and Transportation, and other state and local government officials. HMK alleges that through these fraudulent means Boulders sought to (1) secure enhanced zoning for the Boulders property, (2) keep the enhanced zoning while avoiding highway expenses by substituting access across HMK's land for the proposed "flyover" access to Chippenham Parkway, (3) obtain additional development capacity for the Boulders property, (4) obtain access across HMK's land by using threats of condemnation to extort a right-of-way from HMK, (5) delay the HMK development to shift the costs of constructing a highway extension to HMK, and (6) limit the zoning awarded to HMK, thereby placing HMK in an inferior position.

HMK argues that by supplying false or misleading information to the government and the public, Boulders committed multiple acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, transportation fraud in violation of 18 U.S.C. § 2314, and extortion in violation of 18 U.S.C. § 1951. Because the RICO statute defines "racketeering activity" to include all these offenses, *see* 18 U.S.C. § 1961(1), HMK argues that the actions of the defendants support numerous claims for treble damages under RICO.

Thus, HMK filed a second lawsuit in federal court. Specifically, HMK pled a violation of 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

HMK also pled a violation of § 1962(d), which makes unlawful any conspiracy to violate RICO.

■ The district court granted the defendants' motion for summary judgment. *HMK Corp. v. Walsey*, 637 F.Supp. 710 (E.D.Va.1986). The court ruled that most of the plaintiff's claims were barred for two reasons: first, they had been or could have been raised in the prior litigation, and second, they were time-barred by the state statute of limitations. The court also ruled that the claims that remained must be dismissed because they did not amount to a "pattern of racketeering activity." In reviewing HMK's appeal, we do not reach the issues of res judicata or the statute of limitations.[1] We hold instead that HMK's allegations in their entirety do not amount to a pattern of racketeering activity, and hence that HMK has not adequately pled a RICO violation.

## II.

This circuit recently addressed the question of when a pattern of racketeering activity exists in a strictly commercial context. *International Data Bank v. Zepkin*, 812 F.2d 149 (4th Cir.1987). That case drew upon the Supreme Court's discussion of the RICO pattern requirement in *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In the present case, we address the question of when a RICO pattern exists in a mixed commercial and political context.[2]

In *Sedima*, the Court suggested that "[t]he 'extraordinary' uses to which civil RICO has been put" resulted partly from "the failure of Congress and the courts to develop a meaningful concept of 'pat-

tern.'" 473 U.S. at 500, 105 S.Ct. at 3287. The Court also reviewed the legislative history of RICO in a footnote, intimating that RICO did not target the isolated offender and that the word "pattern" in the statute means more than sporadic instances of criminal activity. *Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14.

Lower courts responded to the Supreme Court's cue with differing interpretations of the pattern requirement. The Eighth Circuit held that several related instances of mail or wire fraud in pursuit of one continuing fraudulent scheme cannot amount to a pattern. *See Superior Oil v. Fulmer*, 785 F.2d 252 (8th Cir.1986). The Second and Eleventh Circuits have continued to emphasize the number of predicate offenses. *United States v. Ianniello*, 808 F.2d 184 (2d Cir.1986); *Bank of America v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir.1986). The Seventh Circuit held that the existence of a pattern must be determined with regard to all the circumstances of a case, rather than an isolated factor or set of factors. *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986).

Our decision in *Zepkin* elaborated a case-by-case standard akin to that announced by the Seventh Circuit in *Morgan*. Under this standard, the court looks to the "criminal dimension and degree" of the alleged misconduct. *Zepkin*, 812 F.2d at 155. The misconduct at issue in *Zepkin*, a securities fraud, was held to constitute "a single, limited scheme" and hence was not a pattern of racketeering activity. *Id.*

1. A recent Supreme Court decision invalidates the district court's holding that HMK's action is time-barred by the Virginia statute of limitations. After the district court rendered its decision in this case, the Supreme Court heard argument on and decided the question of the appropriate statute of limitations to apply to RICO civil enforcement actions. In *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, — U.S. —, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), the court held that the four year federal statute of limitations applicable to Clayton Act actions was the appropriate limitations period for civil RICO actions. *Id.* 107 S.Ct. at 2767. The Supreme Court's decision renders invalid the district court's application of Virginia's one-year "catch- all" limitations period to civil RICO actions.

HMK filed its complaint in this case on January 6, 1986. The activity and injuries alleged by HMK occurred within the previous four years. Therefore, HMK's action is not time-barred.

2. As a preliminary matter, we note that HMK has identified the Chesterfield County Planning Department and the Virginia Department of Highways and Transportation as the enterprises some of the defendants are alleged to have been employed by or associated with. The word "enterprise" in § 1962(c) has been broadly construed to encompass units of government as well as commercial entities. *See United States v. Long*, 651 F.2d 239, 240–41 (4th Cir.1981).

The existence of a pattern thus depends on context, particularly on the nature of the underlying offenses. Attention to the nature of the underlying offenses is necessary because the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine. In *Zepkin* we examined the special characteristics of securities fraud in determining whether a pattern existed:

> Without attempting an all-embracing definition of the pattern requirement, we believe that a single, limited fraudulent scheme, such as the misleading prospectus in this case, is not of itself sufficient to satisfy § 1961(5). Nor do we find 'a pattern' in the fact that one allegedly misleading prospectus reached the hands of ten investors. If the commission of two or more 'acts' to perpetrate a single fraud were held to satisfy the RICO statute, then every fraud would constitute 'a pattern of racketeering activity.' It will be the unusual fraud that does not enlist the mails and wires in its service at least twice. Such an interpretation would thus eliminate the pattern requirement altogether.

812 F.2d at 154–55.

This same focus on context is consistent with the approach taken by the Seventh Circuit in *Lipin Enterprises v. Lee*, 803 F.2d 322 (7th Cir.1986). The Seventh Circuit's later opinion in *Morgan* described how the analysis of the pattern requirement in *Lipin Enterprises* hinged on the characteristics of the dispute, which involved a stock acquisition, and how the pattern requirement could not be interpreted in a manner that would bring every controversy of a particular character within RICO's ambit:

> In *Lipin*, the plaintiff alleged that the defendants defrauded him as part of a single acquisition of over $960,000 worth of stock. It is true that plaintiff was able to point to multiple predicate acts: a false statement made during negotiations for the sale, false financial statements, [and] a false opinion letter from the attorneys.... The existence of multiple predicate acts in *Lipin*, however, is

only because the acquisition of stock in this context is a complicated transaction that requires many separate statements from a variety of persons: financial statements from the accountants, opinions from the lawyers, oral statements from the parties negotiating the sale, and so forth.

*Morgan*, 804 F.2d at 976.

### III.

In the present case, we must look to the nature of the mixed commercial and political context of a development dispute. One characteristic of such disputes is that they typically require the involvement of many government decisionmakers at various stages of the approval process. It therefore cannot be sufficient just to point to multiple predicate acts in furtherance of a scheme to influence a development dispute; otherwise, every such dispute could lead to a cause of action under RICO.

Plaintiff HMK, like the plaintiff in *Lipin, supra*, has alleged many predicate acts of fraud. HMK's complaint is accompanied by a 129–page appendix that gives a detailed account of the defendants' alleged scheme to obtain favorable decisions from Chesterfield County in this development dispute. The presence of numerous predicate acts, however, arises from the complexity of political processes in general, and from those that govern land development in particular.

Virginia law specifies the procedural requirements that must be satisfied in order to amend zoning regulations and classifications. Once a property owner petitions the local governing body or planning commission for a reclassification, the zoning statute provides that before the governing body adopts or approves the proposed amendment, it must be reviewed by the local planning commission. Both bodies must provide public notice and hold public hearings. Once action has been taken on the proposal, parties wishing to contest the decision may seek review in the state circuit court. Va.Code Ann. §§ 15.1–491, 15.-1–493 (1950); *see Vinton v. Falcun Corp.*,

226 Va. 62, 65–66, 306 S.E.2d 867, 869 (1983). Zoning decisions are complex and require consideration of numerous, important, and often competing, interests and concerns. Local planners and legislators must consider such diverse factors as congestion on public streets, adequacy of police and fire protection, adequacy of transportation, sewage facilities, and water, economic development and employment opportunities, and preservation of historic areas and agricultural and forest lands. *See* Va. Code Ann. § 15.1–489 (1950). Such considerations necessarily require the participation of numerous agencies and organizations.

 Nothing in HMK's allegations sets this development dispute above any other dogfight between developers. The district court placed this lawsuit in its proper perspective: "Although the parties have filed voluminous briefs and exhibits detailing the history of this case, the Court finds the case extraordinarily simple. Two developers have crossed swords over a unified section of land so that advantages given one hamper the aspirations of the other." *HMK Corp.*, 637 F.Supp. at 711. The fact that a developer must seek multiple permits and approvals does not bring every such controversy within the ambit of RICO. Here the allegations pertain merely to the allocation of burdens and benefits in the development of two adjoining properties. HMK does not allege that the defendants have previously interfered in the county planning process before this development dispute began or that they have done so again in the period since.

In addition to the number of predicate acts, HMK also points to the span of time that the scheme covered—a span of more than four years. Yet the passage of time, like the complexity of the decisionmaking process, is more a reflection of the nature of zoning approvals rather than of the distinctively pervasive nature of the defendants' scheme. In a private, commercial context, the fact that a scheme spans many years might constitute powerful support for the finding of a pattern of racketeering activity. In a mixed commercial and political context such as this one, where interference in the political process is an important part of the alleged scheme, the passage of time may not have comparable significance.

Public bodies often proceed deliberately. The process of zoning approval often involves multiple hearings and opportunity for public comment. These hearings serve to inform public officials, provide a forum for public opinion, and permit landowners adversely affected by the proposed changes to voice their opposition. *See* 1 R. Anderson, *American Law of Zoning* 235–37 (3d ed. 1986). This inevitably leads to a protraction of the administrative process. But such delay is seen as a worthwhile price for the benefits of due process and accurate decisionmaking. An ordinary rezoning decision, not to mention decisions involving the location of roadways, housing projects, shopping centers, or office complexes, always has the potential to generate intense public opposition, to implicate several levels of government, and to take time to resolve. We obviously do not intimate that a RICO pattern is impossible in such circumstances. The element of "continuity" necessary for a pattern of racketeering activity under RICO cannot, however, be viewed in a vacuum and apart from the inherent characteristics of the decisionmaking process.

Hence, neither the number of predicate acts nor the span of time elevates the alleged scheme in this case to a pattern of racketeering activity under RICO. The gravamen of HMK's complaint is that its opponents deceived various public bodies to obtain favorable land use decisions on the Jahnke-Chippenham tract. Although we hold that no pattern exists in the present case, we want to make clear that the pattern requirement certainly does not bar *all* RICO claims arising in the zoning context. Without attempting to rule on cases that are not before us, we note that a plaintiff who alleged pervasive involvement by a developer in the political process through widespread racketeering activity could indeed meet the pattern requirement. Allowing a RICO claim in more routine situations, where a loser in the political arena simply alleges misrepresentations made by

the victor, "would undermine Congress's intent that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Zepkin*, 812 F.2d at 155.

## IV.

In enacting RICO, Congress did not intend to preempt and federalize the field of state business law. Since the federal cause of action does converge, however, with state actions that comprise predicate acts on which RICO is based, some overlap and displacement of state law is inevitable. To recognize a pattern of racketeering activity under these facts, however, would work a wholesale displacement of state authority that Congress never intended.

Congress provided strong measures to ensure compliance with RICO. In addition to the criminal penalties of imprisonment, fines, and forfeitures in § 1963, Congress also provided strong incentives to civil enforcement. Section 1964(c) permits persons injured in their business or property by a RICO violation to recover treble damages and costs, including a reasonable attorney's fee. These strong incentives to civil enforcement carry with them the concomitant danger that traditional state causes of action aimed at rectifying individual instances of commercial misconduct will be relegated to a position of secondary importance. Such familiar state causes of action as common law misrepresentation and fraud, unfair trade practices, and wrongful franchise termination, not to mention the general run of commercial and contractual disputes, could be eclipsed or resolved primarily as pendent claims in federal court. To secure access to the federal courts and to recover treble damages and attorney's fees under RICO, litigants may attempt to recast such single, isolated schemes as a "pattern of racketeering activity." *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 504–05, 105 S.Ct. 3275, 3294–95, 87 L.Ed.2d 346 (1985) (Marshall, J., dissenting). To permit plaintiffs injured in such schemes to bring their claims under RICO would consign state law to unprece-

dented federal oversight irrespective of the parties' citizenship, and would deprive the states of jurisdiction over these local controversies in a way Congress never intended. Congress chose the "pattern requirement" of § 1962(a) as the mechanism by which "ordinary claims of fraud best left to 'the state common law of fraud' " are distinguished from those activities of such a "criminal dimension and degree" as to warrant the extraordinary remedies of RICO. *Zepkin*, 812 F.2d at 155.

In a mixed commercial-political controversy such as this one, vitiation of congressional intent would bring additional adverse consequences. Permitting litigants to sue under RICO after every loss in the legislative arena, based on allegedly fraudulent conduct by the victors, would impinge upon the separation of powers. Permitting a federal suit for fraud in every state or local political squabble would also impinge on the values of federalism to a far greater extent than the Supreme Court has previously allowed.

These values would be affected in important ways. First, such lawsuits would require federal courts to determine whether fraudulent activity was the cause of the local decision for which plaintiff seeks damages. Hence, courts would often have to discount the presumptively legitimate purpose of the decision of a local governing body and attempt to divine its "actual" purpose. Such inquiry into local land use decisions is, of course, required to determine whether stated purposes serve as pretexts for racially invidious intent, but the Supreme Court has noted that inquiries into legislative purpose are otherwise disfavored. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

Second, such lawsuits would undermine the finality of legislative decisions. If the losers in every commercial dispute over zoning could routinely sue their opponents in federal court for fraud, RICO would effect the wholesale transfer of that most basic of local controversies into a federal forum. That result would implicate many of the concerns expressed by this circuit in

*Hutchinson v. Miller,* 797 F.2d 1279, 1285–87 (4th Cir.1986). In that case, we held that the losing candidate in an election could not recover damages under civil RICO based on allegations of electoral misconduct. We expressed concern over "the continuing assaults on political legitimacy" posed by post-election damage suits brought in federal court by defeated candidates. *Id.* at 1286. Similarly, a RICO lawsuit to contest the methods by which the victors in a zoning fight secured a favorable legislative or administrative outcome would "impair the respect to which the enactments of those duly elected are entitled." *Id.*

## V.

The RICO statute is not, of course, the only statute or even the primary statute relating to the conduct of developers in land use disputes. State laws, including the laws of Virginia, provide extensive procedures under which developers can contest arbitrary zoning and condemnation decisions. Indeed, HMK vigorously pursued those remedies in its earlier state lawsuits. Federal and state criminal laws provide criminal penalties for fraud, bribery, extortion, and other such offenses. The enhanced civil and criminal remedies of RICO, however, are available only when the conduct at issue amounts to a *pattern* of racketeering activity.

Because the misconduct that HMK has alleged in this development dispute does not amount to a pattern of racketeering activity, the judgment of the district court is

AFFIRMED.