BIETER COMPANY, Appellant,

v.

Beatta BLOMQUIST;  Federal Land Company;  Eagan  Tower  Office  Building Partnership;  Eagan  Heights  Commercial Park;  Advance  Developers, Inc.; Cliff Road Properties;  Hoffman Development Group, Inc.;  HDG  Associates Limited Partnership;  Eagan  Associates Limited Partnership;  CRP of Eagan, Inc.;  Robert L. Hoffman;  Patrick C. Hoffman;  Jack F. Daly, Jr., Appellees.

ADVANCE  DEVELOPERS,  INC.;  Cliff Road  Properties;  Hoffman  Development Group, Inc.;  HDG  Associates Limited Partnership;  Eagan  Associates Limited Partnership;  CRP of Eagan, Inc.;  Robert L. Hoffman;  Patrick C. Hoffman;  Jack F. Daly, Jr., Third Party Plaintiffs,

v.

DORSEY  &  WHITNEY,  a  Minnesota partnership;  Ryan Construction Company of Minnesota, Inc., a Minnesota corporation, Third Party Defendants.

No. 92–2018.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1992.

Decided March 8, 1993.

Rehearing Denied April 22, 1993.

**1320**

R. Walter Bachman, Jr., Minneapolis, MN, argued (James McCarthy and Michael Olafson on the brief), for appellant.

Robert Barth, Minneapolis, MN, argued (Cindy J. Larson, Minneapolis, MN and Gary Fuchs, Eagan, MN, on the brief), for appellee Federal Land Co.

George C. Hoff, Eden Prairie, MN, argued, for appellee Blomquist.

Joseph W. Anthony, Minneapolis, MN, argued (Norman Baer and Paul Floyd, on the brief), for Daly, et al.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

HEANEY, Senior Circuit Judge.

Bieter Company, a commercial developer, brought suit against the defendants—competing developers, the City of Eagan, and its past mayor—under the Racketeering Influenced and Corrupt Organizations Act, as amended, 18 U.S.C. §§ 1961–1968 (1988) ("RICO"), in the United States District Court for the District of Minnesota. Finding that Bieter's allegations of bribery of city officials in furtherance of competing developments failed to satisfy the injury and causation requirements under RICO, the district court granted summary judgment to the defendants. After carefully reviewing the allegations and evidence presented below, we find that the district court adopted excessively narrow views of causation and injury. Were we to limit RICO's application in this fashion, we not only would undermine RICO as a means of rooting out public corruption, but we would provide a formula to those who seek to achieve private gain through corruption of our democratic processes. Accordingly, we reverse.

I

In reviewing a grant of summary judgment, we apply the same standard as does the district court. We therefore will affirm the district court if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, "we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor." *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992). Should a jury be capable of reasonably finding for either party on the evidence presented, a grant of summary judgment is inappropriate. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Because this case is brought under RICO's civil provisions, the necessary findings need simply be made by a preponderance of the evidence. *Fleisch-*

*hauer v. Feltner,* 879 F.2d 1290, 1296 (6th Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1302 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *Wilcox v. First Interstate Bank,* 815 F.2d 522, 531 (9th Cir.1987); *Cullen v. Margiotta,* 811 F.2d 698, 731 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Armco Indus. Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 480–81 (5th Cir.1986); *United States v. Local 560, Int'l Bhd. of Teamsters,* 780 F.2d 267, 279–80 n. 12 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *see Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 491, 105 S.Ct. 3275, 3282, 87 L.Ed.2d 346 (1985).

## II

Our description of the facts is substantially repetitive of the district court's factual description. Like the district court, we restrict our recitation to those facts necessary to resolution of the appeal before us, *see Bieter Co. v. Blomquist,* 784 F.Supp. 1405, 1406 n. 1 (D.Minn.1992), but at times we deviate from the district court, drawing what we see as reasonable inferences where the district court saw otherwise. Consequently our statement of the facts is by no means a statement of what the plaintiff has proved, but a statement of what factual conclusions a jury could reasonably draw from all of the evidence presented.

## A

This case arises out of intense competition between commercial developers of real estate in Eagan, Minnesota. Plaintiff Bieter Company is a Minnesota partnership that owns land at the northeast quadrant of the intersection of Interstate Highway 35E and Diffley Road. When Bieter acquired this land in 1978 it was zoned for agricultural use, a "holding" category in which property was placed until it could be zoned more specifically. *See Amcon Corp. v. City of Eagan,* 348 N.W.2d 66, 71 (Minn. 1984). In 1983 the city amended its Comprehensive Land Use Guide Plan and desig-

nated the Bieter property to be D–II (mixed residential, 3–6 units per acre). Though the city used the Comprehensive Guide Plan as a planning aid, it was not binding. Bieter desires to develop this property as a regional shopping center, which would require rezoning and a change to the Comprehensive Guide Plan.

Federal Land Company, Eagan Tower Office Building Partnership, and Eagan Heights Commercial Park (collectively referred to as "Federal") are commercial real estate developers that own or control substantial portions of commercially zoned real estate in the City of Eagan, including Yankee Square Center and Town Centre, two shopping centers a short distance to the north of the Bieter property.

Advance Developers Inc., Cliff Road Properties, Hoffman Development Group Inc., HDG Associates Limited Partnership, Eagan Associates Limited Partnership, CRP of Eagan Inc., Robert L. Hoffman, Patrick C. Hoffman, and Jack F. Daly Jr. ("the Hoffman defendants") controlled and participated in the development of the property located at the northwest quadrant of the intersection of Interstate 35E and Cliff Road, a relatively short distance from the 35E–Diffley Road intersection. Currently located on this property is a shopping center known as "Cliff Lake Centre," whose anchor tenants are Target Stores and Cub Foods. Federal owns property next to Cliff Lake Centre as well.

The final defendant is Beatta Blomquist. Blomquist was the mayor of the City of Eagan from January 1, 1980, through December 31, 1987. In the time period relevant to this lawsuit, Blomquist was also the majority shareholder and an officer of McBlom Enterprises Inc., now known as Video Hollywood Style of Eagan Inc., which operated video and photo stores in the City of Eagan.

The third-party defendants in this case are Dorsey & Whitney and Ryan Construction Company. The Hoffman defendants assert claims for contribution and indemnity against these third-party defendants based upon their role in the development of Cliff Lake Centre, and specifically their

role in obtaining Target as an anchor tenant.

## B

Bieter began making its plans for a regional shopping center known in 1986. Bieter formally announced its proposed development in September 1986 and a month later formally filed applications with the City to seek the necessary rezoning, preliminary plat approval, and amendment of the Comprehensive Guide Plan. At the time of its proposal, Bieter had solicited major tenants for the shopping center, including Northwest Racquet & Swim Club and Cub Foods, and had the commitment of Target Stores to be an anchor tenant. Bieter proposed an ambitious development involving four large anchor tenant stores, costing in the range of 50 million dollars, and requiring the rezoning of about 90 acres of land.

The first public hearing on the Bieter proposal was held on November 25, 1986, before the Eagan Advisory Planning Commission ("APC"). After extensive discussion, the hearing was continued until the January 1987 APC meeting to allow further study. The Bieter proposal came once again before the APC on January 27, 1987. City staff and Bieter representatives made presentations. Members of the public spoke both in support of and against the Bieter proposal. The APC decided by a 6–1 vote to recommend denial of Bieter's application. Dave Gustafson was the only APC member to cast a dissenting vote.

The Bieter proposal came before the Eagan City Council on February 3, 1987. The city council at the time consisted of Mayor Blomquist, Thomas Egan, James Smith, Theodore Wachter, and Victor Ellison. The council heard from the city staff, the Bieter representatives, and members of the public. The council decided by a 4–1 vote to deny Bieter's applications for rezoning and a change in the Comprehensive Guide Plan. The only vote in favor of Bieter's applications was by Councilmember Ellison.

At this point, Bieter was down, but not out, because elections were to be held in the fall of 1987, and Bieter planned on making commercial development in Eagan an issue in the election. Target Stores agreed to maintain their commitment to Bieter through the election, in part because its internal studies had shown Bieter's location to be the best available in Eagan. Several candidates who supported Bieter's proposal were running for key offices. Councilmember Ellison was running for mayor and APC member Gustafson was running for the city council.

Not surprisingly, Bieter's proposal had run into opposition by competing developers in Eagan, including Federal and the Hoffman defendants. In addition to voicing their opposition through letters and at public meetings, the Hoffman defendants announced in January 1987 their plans for a large-scale retail development of their own to be located not far from Bieter's proposed development. During the 1987 elections, the candidates treated the two developments as an either/or proposition: if you were in favor of one, you were against the other. This understanding was reinforced by Target's announcement in July 1987 that it would also be an anchor tenant in the competing Cliff Lake project.

The candidates who favored the Bieter proposal won the election, with Ellison elected mayor and Gustafson elected to the city council. The remainder of the council consisted of Wachter, Smith, and Pam McCrea, a former APC member who was appointed to the council by Ellison. Bieter appeared to have won, but before the newly elected officials took office, the lame-duck council took up the Hoffman defendants' Cliff Lake proposal and approved it by a vote of 3–2, despite the APC having voted to deny the applications. Blomquist, Smith, and Egan provided the needed votes. Ellison indicated that the entire project would likely be reconsidered by the new city council after January 1 and warned the Hoffman defendants that they proceeded at their own risk. In an apparent attempt to bind the new city council, a special meeting was called of the outgoing city council on December 30, which was attended only by Blomquist, Smith, and Egan, who moved to reconsider their previous actions and then voted against recon-

sideration. After the initial vote in favor of the Cliff Lake development, Target notified Bieter in writing that it was no longer interested in pursuing development options with Bieter in Eagan.

The new city council voted to rescind the previous approval granted to the Cliff Lake development. Later, however, on the advice of counsel, it reversed itself and voted to approve the development. The city council was advised that the city was legally bound by the previous council's actions and that should the council continue its opposition to the development, the developers would likely bring legal action against the city. Bieter was nonetheless invited to reapply for rezoning, though such application would be subject to the city's longstanding, though unwritten, policy of only earning serious consideration if accompanied by identified, committed users. The users included in Bieter's initial application were, of course, no longer interested as they had entered into agreements with the Cliff Lake development. Bieter has been unable to find comparable users, and consequently has not reapplied for rezoning.[1]

## C

Well into the discovery process in its initial litigation against these defendants, Bieter discovered evidence that suggested Federal and the Hoffman defendants had bribed Mayor Blomquist and Councilmembers Smith and Wachter. Based on that evidence, Bieter amended its complaint, adding claims alleging RICO violations.[2]

■ We agree with the district court that there is sufficient evidence to raise a genuine issue of fact as to whether Federal bribed Blomquist by providing her with favorable rental treatment in connection with her video rental and photo stores in Federal's Yankee Square Center and Town Centre. Bieter presents evidence that beginning in late 1984 Federal gave Blomquist's video rental business space in its Yankee Square Center for substantially below market-value rates. Even after the original lease period expired, the favorable lease terms were extended monthly through 1986 and into 1987. In March 1986 Blomquist's business located a video and photo store in Federal's Town Centre. Bieter does not claim that the rental rate itself in that lease constituted a bribe. However, in February 1987, the month in which Bieter's proposal appeared before the City Council, past-due rent of approximately $7,800 was written-off, and thus forgiven, by Federal on Blomquist's store. From 1985 through 1987, Blomquist consistently voted in accordance with Federal's interests.

■ The evidence is also sufficient to raise a genuine issue of fact as to whether the Hoffman defendants bribed Blomquist to vote in favor of the Cliff Lake development by creating sham political committees through which the Hoffmans funneled almost $5,000 to support Blomquist in her November 1987 election campaign. There is also evidence that the Hoffmans bribed Blomquist through oral promises of an option to lease space at Cliff Lake Centre prior to the December 1, 1987, vote.

1. We recognize that while in early settlement negotiations with the city, Bieter's representative suggested that should the city rezone its property without formal application a settlement could be reached. (These negotiations involved a still pending state court action.) In the course of those discussions, Bieter's representative indicated that users were not a problem. The district court relied on this statement in its holding below. Bieter argues that the representative was uninformed, and that users are indeed a problem. It strikes us that users are far less a problem for Bieter once the rezoning has taken place, making its position in settlement negotiations perfectly reasonable. Should Bieter have to go through the normal application process, however, the city's refusal to consider rezoning applications without committed users would continue to be a problem. In any event, at this stage in the proceedings, the issue of whether Bieter could find users, or whether it in fact needed users to be rezoned, appears to be a jury question.

2. Bieter's original complaint, filed in November 1989, alleged violations of state and federal antitrust laws and asserted state law tort claims. In June 1991 the court granted Bieter leave to amend its complaint, at which time the antitrust counts were deleted and two RICO counts were added.

Bieter has produced evidence of several additional predicate acts of the Hoffman defendants in connection with the sham political committees and subsequent efforts to conceal their true nature and source of funding. These acts include bribery and witness tampering involving Joel Pearson, one of two persons the Hoffmans paid to act as a "front" for their political committees. Pearson has testified by deposition that he was coached to lie to authorities in connection with a 1987 criminal investigation and to lie in depositions taken in this lawsuit, and that he was promised payment for his "cooperation" in the form of lucrative real estate listings (Pearson is a real estate agent and estimates the commissions to have been worth approximately one hundred thousand dollars) and forgiveness of rent. The Hoffmans also provided Pearson with counsel at his depositions, free of charge.

In its response to defendants' motions for summary judgment before the district court, Bieter alleged for the first time that Federal bribed not only Blomquist but also Councilmembers Smith and Wachter in connection with the Bieter proposal.[3] Bieter alleges that Federal bribed Smith by offering him a free fishing trip to Canada and that Federal bribed Wachter by providing him subcontracts for construction work. The district court held that these allegations were supported by too little evidence to create a jury question. After a de novo review of the record, we conclude that sufficient evidence exists to raise such a question.

Sometime during the fall of 1986, Vern Colon, a principal of Federal, offered to take Smith on a fly-in fishing trip to Manitoba. Smith denies that the trip had anything to do with any business before the Eagan City Council, but he nonetheless took the trip in June 1987, for which he paid nothing. Smith now admits to the entire trip (and several subsequent trips), but when deposed in the state court action in August 1987 (when the election was in progress), Smith denied that he had ever received any such trip from the Colons. Though the district court found Smith's assertions that the trip was not intended to influence his votes on any matters before the city council persuasive, Bieter argues correctly that a jury could reasonably find otherwise. Given the free trip, the favorable vote, and the subsequent lie under oath, a jury could reasonably find—particularly when applying the preponderance burden of proof—that Federal did bribe Smith to defeat Bieter's application for rezoning. *See United States v. Friedman,* 854 F.2d 535, 558–59 (2d Cir.1988) (finding no need for direct proof of bribe in criminal RICO conviction), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

Bieter also alleges that Federal bribed Councilmember Wachter by offering him two construction contracts in early 1987. Though Wachter had been a contractor in Eagan for over two decades, and a councilmember since 1971, he had received only two minor jobs from Federal. In early 1987, however, he found himself with two contracts from Federal worth over $17,000. One of the contracts was performed during the two weeks prior to the February 3 vote, and the second, the more substantial of the two, was discussed by Wachter and Colon before a city council meeting attended by Colon, which, according to Wachter, may have been the February 3 meeting. These contracts were not bid and were not disclosed prior to their being discovered by Bieter during the course of this litigation. Again the district court found insufficient evidence to create a jury question, crediting Wachter's testimony that the contracts had no influence over his vote on the Bieter proposal. We agree that a jury could find this evidence insufficient, particularly because Wachter voted against the Cliff Lake proposal which Bieter asserts Federal supported, and were these incidents standing alone, we might agree that summary judgment is appropriate. These transactions do not stand alone, however, and given the other evidence of Federal's illicit attempts

3. We note, however, that these motions were considered as discovery was ongoing. It is no surprise, therefore, that Bieter would continue to uncover evidence of the conspiracy allegedly entered into by Federal and the Hoffman defendants.

to influence the city council, we believe that a jury could reasonably find that Federal bribed Wachter as well. The district court appears satisfied that because Wachter was paid no more than market value for his services, it is unlikely that this was a bribe. There is no requirement, however, that such incentives be paid at above market-value rates. Had Colon offered Wachter $500,000 worth of contracts—all at market value, but completely out of the blue—we doubt that the district court would have found insufficient evidence to create a jury question. In fact, the district court's finding that Pearson may have been bribed relied on his assertion that he had been promised sizeable commissions on real estate listings, though presumably those commissions were to be calculated at his normal rate.

## III

Based on the foregoing, Bieter argues that it was injured by the defendants' conspiracy to prevent it from developing its proposed shopping center in Eagan and that its injury was proximately caused by the conspiracy. The district court treated the February 1987 denial of rezoning of Bieter's property and the December 1987 approval of the Cliff Lake development as separate events, and found that any injury Bieter suffered from the denial of rezoning was not proximately caused by the defendants and that Bieter suffered no cognizable injury from the approval of the Cliff Lake development. *Bieter*, 784 F.Supp. at 1411. Bieter argues that a jury could reasonably view the two events as part of a single course of conduct that was the proximate cause of Bieter's injury, and we agree.

## A

RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c) (1988). The Supreme Court has construed the "by reason of" language to incorporate the traditional requirements of proximate or legal causation, as opposed to mere factual or "but for" causation. *See Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).[4] The primary consideration in determining whether a plaintiff's injuries have been proximately caused by a defendant's violations of section 1962 is the directness of the relationship "between the injury asserted and the injurious conduct alleged." *Id.,* at ——, 112 S.Ct. at 1318, 117 L.Ed.2d at 544. The Supreme Court discussed three reasons for the directness requirement. "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id.* at ——, 112 S.Ct. at 1318, 117 L.Ed.2d at 545. "Second, ... recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* Third, "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.*

The second and third reasons present no significant problem in this case. There is no risk of multiple recovery and, short of the Eagan citizens' loss of good govern-

---

**4.** The district court found our decisions in *Alexander Grant & Co. v. Tiffany Indus.,* 742 F.2d 408, 411 nn. 7 & 8 (8th Cir.1984), *vacated on other grounds,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), and *Terre du Lac Ass'n v. Terre du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985), which held that a plaintiff who was only indirectly injured by a defendant's RICO violations could nonetheless seek damages under civil RICO, consistent with a proximate cause requirement. *Bieter,* 784 F.Supp. at 1411 n. 4. Any inconsistencies that potential future applications of those decisions may bring to light are, of course, foreclosed by the Supreme Court's holding in *Holmes.*

ment (not a particularly concrete injury), there are no other directly injured parties who might bring suit.[5] We are left, then, with the initial difficulty of determining to what degree Bieter's injuries were caused by the defendants' actions, and to what degree any injury may be attributable to other causes.

Bieter argues that the bribery of the city officials was intended to prevent its proposed development from receiving the necessary approvals and to assure approval of the competing Cliff Lake development. Because those events occurred as the defendants had intended, and those events led to Bieter's inability to proceed with its proposed development, Bieter alleges that it was injured directly by the defendants' illegal conduct. The district court found Bieter's argument flawed because Bieter's proposal would have been defeated regardless of the defendants' actions.

The district court's holding relies on a narrow view of causation in group decision-making. A Minnesota statute mandates that changes in zoning by a city council, which Bieter's proposal required, be approved "by a two-thirds vote of all its members." Minn.Stat. § 462.357, subd. 2 (1991). Consequently, Bieter's application required at least four votes of the five-member city council. As the application received only one vote, the district court held that Bieter's proposal would have been defeated regardless of the alleged bribery. Because we find that the allegations and evidence against Blomquist, Smith, and Wachter all present questions for the jury, Bieter could point to three tainted votes, which are the three additional votes it required.

We hesitate to rest our analysis at this point, however, for we find that it relies on too narrow a view of causation in group decisionmaking, such as that which occurs within a city council. Were we to accept this narrow a view, the defendants' argument based on recusal would naturally follow. Defendants argue that even were three votes found to have been bribed, the proper remedy would be recusal of those votes, leaving Bieter with a 1–1 vote, three votes short of the required four. Were this court to adopt the defendants' view, we would simply provide future competitors in the political-commercial realm with a formula for defeating a competitor's proposal: rather than bribe a legislator to vote one way or the other, simply create a relationship that will cause a legislator to recuse him or herself due to conflict of interest. The same result would be reached, and no potential RICO liability would be incurred.

Worse yet, even though a legislator were to be recused from voting on a given proposal, he or she would remain free to discuss the merits of the proposal with his or her colleagues behind the scenes. Such conduct could very likely influence the vote short of the bribed legislator imposing his or her views on the others.

Recognizing that it might lose on a narrow vote-counting view of causation, Bieter argued to the district court that the bribery of Blomquist tainted the process sufficiently to satisfy proximate causation. Bieter relied on Blomquist's role as mayor, her opposition to the Bieter development as communicated to Target and to the APC, and the view of then-Councilmember Ellison that Blomquist, Egan, and Smith voted as a bloc. The district court found this evidence wanting in the face of affidavits from the other councilmembers that stated each of them had voted independently, and

---

5. There may, of course, be others who are remotely injured. For example, tenants of the Cliff Lake development might argue that they were injured by having incurred higher costs than they would have through Bieter's proposal (if such injury could be proven), but this is the sort of injury that is too remote to satisfy proximate cause. Had such tenants brought suit, a court would likely hold that the proper plaintiff is the injured developer, precisely the case we have before us.

An argument may also be made that this is not a case for a private attorney general, but that if a case is to be brought for the defendants' misconduct in this case, it should be a criminal case. Nothing in our holding prevents criminal charges from being filed in a case such as this, but the Supreme Court has rejected any notion that a criminal charge or conviction is a necessary predicate to a civil RICO suit. See Sedima, 473 U.S. at 493, 105 S.Ct. at 3283.

that Blomquist had not attempted to influence any of them prior to the February 3 meeting. Again, we find that the district court has failed to draw all reasonable inferences in favor of the nonmovant.

A jury could reasonably find that Bieter's injuries were caused by the defendants' bribery of Blomquist, Smith, and Wachter. Such a finding need not be predicated on any vote-counting done by the fact-finder. The jury could instead find that given the extent of Blomquist's alleged role in the proceedings—not simply her efforts on behalf of Federal and the Hoffman defendants involving the Cliff Lake project, but her lobbying of the APC and other city administrators to oppose the project, her attempts to persuade Target to consider another site, and her seeming control over the conduct of city business—the defendants' bribery of her caused Bieter's injuries. A finding that bribery of a councilmember proximately caused a plaintiff's injury can therefore rest on evidence of that individual's influence over the proceedings. A contrary finding would simply encourage potential wrongdoers to place the most efficient bribe possible: one that will reach the desired result without the expense of bribing a majority (or supermajority) of councilmembers. We next move to what injuries Bieter may have actually suffered.

**B**

As the uses of civil RICO have expanded since its enactment in 1970, courts have sought to restrict its use through imposition of various standing restrictions that would require a plaintiff to plead, for example, racketeering injury or competitive injury. *See generally Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482, 485 (2d Cir.1984) (discussing competitive and racketeering injury requirements), *rev'd,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Bennett v. Berg,* 685 F.2d 1053, 1058–59 (8th Cir. 1982) (discussing competitive or commercial injury requirement), *on rehearing,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Despite this movement in the lower

courts, the Supreme Court rejected any additional standing requirements in civil RICO cases, finding that

> the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. . . .
> But the statute requires no more than this. . . . [T]he compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.

*Sedima,* 473 U.S. at 496–97, 105 S.Ct. at 3285.

In the instant case, the district court imposed a standing requirement of its own, borrowing from the realm of regulatory takings, when it held that Bieter had not been injured by the denial of rezoning because it had not renewed its application. *See Bieter,* 784 F.Supp. at 1414. In so doing, the court relied on an earlier opinion issued by the same court, *Metal Coating Minneapolis v. Minneapolis Community Dev. Agency,* No. Civ. 4–89–415, 1989 WL 296682 (D.Minn. Nov. 22, 1989). Both the *Bieter* court and the *Metal Coating* court in turn relied on *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), in which the Supreme Court dismissed a developer's unconstitutional taking claim.

In *Williamson,* a county planning commission rejected a developer's proposed site plan, and the developer sued, alleging an unconstitutional taking. Following a jury verdict in the developer's favor, the trial court granted the defendants a judgment notwithstanding the verdict, *id.* at 183, 105 S.Ct. at 3115, which the Supreme Court eventually upheld. The Supreme Court found that the planning commission's action was not ripe for judicial review because the developer had failed to pursue possible variances that would have allowed it to develop its property as planned. *Id.* at 187–91, 105 S.Ct. at 3116–19. Relying on *Williamson,* the *Bieter* court found that

Bieter's failure to reapply for rezoning once the new council members took office in January 1988 similarly prevented Bieter from sustaining "the sort of actual, concrete injury necessary to establish a cognizable injury under the RICO Act." *Bieter*, 784 F.Supp. at 1414.

Rather than import a standing requirement from the realm of regulatory takings,[6] the district court should have looked to similar cases in the civil RICO setting. Other circuits have considered the application of civil RICO to the bribery of public officials, *see Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1067 (3d Cir.1988), *aff'd on other grounds*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990), and in the context of competing developers in zoning disputes. *See HMK Corp. v. Walsey*, 828 F.2d 1071, 1075 (4th Cir.1987), *cert. denied*, 484 U.S. 1009, 108 S.Ct. 706, 98 L.Ed.2d 657 (1988).

*Environmental Tectonics* involved two companies that competed for contracts to sell aeromedical equipment to foreign governments. After learning that it had lost a contract with the Federal Republic of Nigeria to Kirkpatrick despite having submitted a lower bid, Environmental Tectonics investigated and found that Kirkpatrick had bribed the Nigerian government during the bid proceedings. *Environmental Tectonics*, 847 F.2d at 1055–56. Following the sentencing of Kirkpatrick for criminal violations, Environmental Tectonics brought suit alleging RICO and antitrust violations as well as violation of New Jersey antiracketeering provisions. The district court dismissed on a number of grounds, but in so doing, denied defendants' assertion that Environmental Tectonics had suffered no injury. *Environmental Tectonics Corp. v. W.S. Kirkpatrick & Co.*, 659 F.Supp. 1381, 1389 (D.N.J.1987), *rev'd*, 847 F.2d 1052 (3d Cir.1988), *aff'd on other grounds*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

On this issue, the Third Circuit agreed. The court of appeals found sufficient injury under both the antitrust and RICO statutes:

> Plaintiff alleged that it and the defendants are both in the business of supplying aeromedical facilities and equipment to foreign air forces, and that both plaintiff and defendants were in direct competition for the Nigerian Air Force bid. As the district court noted, short of alleging that it was next in line for the Nigerian contract, [Environmental Tectonics] could not have pleaded a more direct injury from defendants' alleged violation of [the antitrust laws].
>
> The question of [Environmental Tectonics]'s standing to bring its RICO and Anti–Racketeering Act claims is somewhat easier to resolve. To have standing to assert a civil RICO claim, [Environmental Tectonics] need only allege an injury to its business or property resulting from some or all of the predicate acts that comprise the RICO violation. [Environmental Tectonics]'s allegations in the amended complaint of injury from the bribery scheme—a scheme that the amended complaint charges with sufficient factual specificity—meet this standard.

*Environmental Tectonics*, 847 F.2d at 1067 (citations omitted).

The parallels between the facts in *Environmental Tectonics* and this case are striking: public officials were bribed in the context of competing commercial enterprises and the injury to the plaintiff is difficult to ascertain with precision. The question then arises, is the difficulty in precise determination of injury grounds to keep the case from the jury, or does that difficulty simply reflect on the question of damages?

Bieter argues that because of the defendants' violations of section 1962, it lost approval of its proposed development in February 1987, lost a committed anchor tenant in Target, and subsequently lost the capability to develop the property as it had intended. Defendants argue that this is simply a lost opportunity, not the sort of

---

6. The requirement of commercial or competitive injury originated in the antitrust laws and was imported into several early civil RICO decisions. *See Sedima*, 741 F.2d at 485; *Bennett*, 685 F.2d at 1058–59.

actual, concrete injury for which RICO was designed.[7] We do not question that the precise degree of Bieter's injury is somewhat speculative, but it is simply the periphery, and not the core, which we so describe. Bieter was injured.

■ Viewing the facts in the light most favorable to Bieter, it had a development proposal that, but for the corruption of various public officials, would have been approved. Despite its candidates having won in the 1987 election, the loss of its committed anchor tenant made reapplication for rezoning futile. It has not suffered a taking—its property has not lost all value—but it has lost what likely would have been the most valuable use of its property, and that loss is attributable to the defendants' conduct. Such injury satisfies section 1964's requirement of injury to "business or property," though it would not satisfy the takings analysis of *Williamson*.[8]

Other courts have recognized that civil RICO is "a statutory tort remedy—simply one with particularly drastic remedies." *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir.1988). It follows, then, that limitations on damages suggested by tort law would also apply to civil RICO. Defendants' arguments that Bieter's failure to reapply results in no cognizable injury under RICO would be better made to a jury under the rubric of failure to mitigate damages. *See Restatement (Second) of Torts* § 918 (1977); 3 Edward J. Devitt et al., *Federal Jury Practice and Instructions* § 86.08 (4th ed. 1987). Though we find that Bieter was injured, a jury would certainly be expected to consider evidence of the potential uses of Bieter's property that may not have been pursued, as opposed to simply granting damages for the difference between the undeveloped and developed property values.

Were we to accept the district court's analogy to *Williamson*, the application of civil RICO in cases of public corruption would appear to be restricted to those cases in which a plaintiff suffers a taking because of bribery or the like. We find no support for restricting RICO's application in that manner. Such a holding would not be consistent with the purposes of RICO, one of which is to root out public corruption, *see United States v. Angelilli*, 660 F.2d 23, 32–33 (2d Cir.1981) (discussing legislative history), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982), and would remove the threat of heavy civil sanctions from those who choose to corrupt public officials for their own gain but do so prior to having lost to their competitors [9]—

7. Blomquist places particular reliance on *Oscar v. University Students Co-op. Ass'n*, 939 F.2d 808 (9th Cir.1991), *on rehearing*, 965 F.2d 783 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992), in which a panel of the Ninth Circuit held that "whether a particular interest amounts to property [under RICO] is quintessentially a question of state law." *Id.* at 810–11. Blomquist fails to note, however, that the panel found a property interest in a leasehold in that case, only to have the court rule otherwise en banc. The en banc court adopted none of the panel's opinion, instead finding that the alleged injury (loss of value of leasehold due to narcotics trafficking) was akin to a nuisance, which the court analogized to personal injury, an injury the Ninth Circuit had previously held did not satisfy RICO. *Oscar*, 965 F.2d at 787. The en banc court made no reference to state law controlling the existence of a property interest, as it does in takings or due process cases. The *Oscar* court's actual rationale—the analogy to personal injury—has no effect on this case, for Bieter's injuries are not due to a neighboring nuisance, but to the defendants' corruption of the zoning process in the City of Eagan.

8. Though we view the district court's reliance on *Williamson* as imposing a requirement that an injury to property be cognizable as a taking to satisfy RICO, the district court may instead (or in addition) have intended to impose an exhaustion of remedies requirement, which it then found Bieter not to have satisfied. We do not dispute that an injured party under these circumstances would normally be required to exhaust any remedies it may have with the appropriate zoning authority, but we find that Bieter has properly argued that any further zoning requests absent a committed anchor tenant would be futile, thereby excepting Bieter from any exhaustion requirement.

9. In order for corruption of a zoning process to satisfy a takings approach to the injury requirement under RICO, the putative plaintiff would have to first gain the necessary rezoning, thereby acquiring a cognizable property right. The putative defendant would then have to place the necessary bribes to have the plaintiff's property

the very time when such villainy can have the most effect.

At the same time, we do not hold that all attempts at public corruption provide causes of action under RICO. Without deciding cases not before us, we suggest that hypothetical variations of the facts in the instant case would remove the case from RICO's grasp. Had Bieter's proposal been approved in February, for example, despite the alleged bribery of Blomquist, Bieter would have no injury under RICO. But that case is not before us, and the case that is before us, viewed in the light most favorable to the nonmovant, presents concrete injury proximately caused by the defendants' violations of section 1962.

In response to the fear that our holding today might open the floodgates for any commercial developer who has lost to a competitor before a governmental planning commission to pursue treble damages in federal court, we note that our holding is consistent with that in *HMK Corp. v. Walsey*, 828 F.2d 1071 (4th Cir.1987). In *HMK Corp.*, the Fourth Circuit affirmed a grant of summary judgment to the defendants in a civil RICO action between competing commercial developers. The plaintiff alleged that the defendant had obtained favorable decisions from governmental bodies through "a series of misrepresentations, false statements, half-truths, and omissions." *Id.* at 1072. The court of appeals found that "[n]othing in HMK's allegations sets this development dispute above any other dogfight between developers," *id.* at 1075, but left open the possibility of a civil RICO action in a zoning dispute:

> Although we hold that no pattern [of racketeering activity] exists in the present case, we want to make clear that the pattern requirement certainly does not bar *all* RICO claims arising in the zoning context. Without attempting to rule on cases that are not before us, we note that a plaintiff who alleged pervasive involvement by a developer in the political process through widespread racketeering activity could indeed meet the

rezoned noncommercial, which would consti-

> pattern requirement. Allowing a RICO claim in more routine situations, where a loser in the political arena simply alleges misrepresentations made by the victor, "would undermine Congress's intent that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being."

*Id.* at 1075–75 (quoting *International Data Bank v. Zepkin*, 812 F.2d 149, 155 (4th Cir.1987)). We believe that Bieter's allegations fall within the exception expressly left open by the Fourth Circuit, and that just as allowing every losing developer in a zoning dispute to sue under RICO would undermine Congress's intent, so would not allowing a suit such as Bieter's to proceed.

### IV

Bieter's complaint also includes a common-law tort claim for intentional interference with business relations. The district court dismissed this claim summarily on the grounds that as Bieter could not satisfy RICO's injury requirement, its injury was too speculative to allow recovery. Because our holding reverses the district court's ruling that Bieter failed to satisfy RICO's injury requirement, we likewise reverse the dismissal of the pendent tortious interference claim as well.

### V

Having found that, when viewed in the light most favorable to Bieter, the evidence before the district court precluded summary judgment on the issues of injury and causation under RICO, we reverse the order of the district court and remand for proceedings consistent with this opinion.

tute an injury under such a restrictive approach.