836 F.2d 1342
 RICO Bus.Disp.Guide 6837
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Stanley W. EPSTEIN, Marjorie Epstein Massing, Ben Ami
Epstein, Doritte Cohen, Joann Phawley, Michael
Massing, Plaintiffs-Appellants,
v.
Leonard EPSTEIN, Lillian Epstein, Barry Epstein, Chesapeake
Leasing, Southland Industries, Inc., Defendants-Appellees.
Stanley W. EPSTEIN, Marjorie Epstein Massing, Ben Ami
Epstein, Doritte Cohen, Joann Phawley, Michael
Massing, Plaintiffs-Appellees,
v.
Leonard Epstein, Lillian Epstein, Barry Epstein, Southland
Industries, Inc., Chesapeake Leasing Company,
Defendants-Appellants.
 No. 87-2083(L), 87-2094.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 4, 1987.
Decided Jan. 8, 1988.
 
 Ronald Monroe Gates (Kenneth A. Norman, Boyd, Payne, Gates & Farthing, P.C. on brief) for appellants.
 Donald H. Clark ( Thomas R. Franz, Clifford A. Coppola, Clark & Stant, P.C. on brief) for appellees.
 Before SPROUSE and WILKINSON, Circuit Judges, and TERRENCE WILLIAM BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Upon his death, Ben Epstein devised his 825 shares of stock in Southland Industries to a trust for the benefit of his three children, Stanley, Leonard, and their sister Marjorie. The 825 shares represented 50% of the company's outstanding stock; Leonard Epstein owned the remaining 50%. Leonard was named executor of Ben's estate and trustee of the trust.
 
 
 2
 In 1971, Stanley and Marjorie filed a petition in Florida state court, seeking to remove Leonard as executor, alleging wasting and maladministration of the estate. Leonard submitted his resignation and renounced his right to act as trustee. The Florida court appointed City National Bank of Miami (City National) executor and trustee.
 
 
 3
 Leonard operated Southland, and in 1983, Stanley and Marjorie sued Leonard and City National in Florida state court, alleging that Leonard, with the consent of City National, was improperly using the revenue of Southland and committing other wrongful acts in his administration of the company. They sought damages, an accounting, removal of City National as executor and trustee, and other relief.
 
 
 4
 In 1984, Southland sought to issue 370 new shares of stock. The company offered 185 shares to Leonard and 185 to the trust, but only Leonard subscribed. Leonard claims that the company merely sought to raise funds by issuing the new stock; Stanley and Marjorie contend that the issue was designed to give Leonard voting control of the company and to thereby depress the value of the trust's holdings. Stanley and Marjorie objected to the issue in the pending Florida suit.
 
 
 5
 In 1985, City National agreed to sell to Leonard the 825 shares of Southland stock held by the trust. City National filed a petition in the pending Florida suit, seeking approval of the sale. The Florida court held a hearing and approved the sale. Southland's stock had been appraised as of December 31, 1983, but the court gave the trustee 60 days in which to obtain an updated appraisal. Stanley and Marjorie were given permission to obtain and file an appraisal.
 
 
 6
 City National hired Arthur Young, which appraised the stock at $1,920 per share as of December 31, 1984. After hearings, the court adopted this figure. Stanley and Marjorie had selected an accountant to appraise the stock, but did not submit their evaluation until eight to nine months after the time allotted by the court. They filed a "Limited Scope Valuation Analysis," which did not purport to determine the fair market value of the stock. The state court issued its final order approving the sale of the Trust's stock in August, 1986.
 
 
 7
 Stanley and Marjorie brought suit in federal court in Virginia in June, 1986. They claimed that Leonard, along with his wife and son, who at all relevant times sat with Leonard on Southland's board of directors, violated Sec. 10(b) of the Securities Exchange Act, 15 U.S.C. Sec. 78j(b), and Rule 10b-5, 17 CFR Sec. 240.10b-5, in connection with the sale of the trust's Southland stock. They alleged that the sale to Leonard in 1984 of 185 Southland shares was part of a fraudulent scheme to win voting control of Southland and to lower the value of the trust's stock by reducing the trust's holdings to a minority position. They also alleged that Leonard, his wife, and son withheld information about the Arthur Young appraiser who performed the December 31, 1984 appraisal. Finally, they alleged that the defendants' activities in connection with the sale of the trust's stock constituted a violation of the Racketeer Influenced and Corrupt Organizations statute (RICO), 18 U.S.C. Sec. 1961 et seq.
 
 
 8
 We affirm the district court's dismissal of the plaintiffs' claims under Sec. 10(b) and Rule 10b-5 because plaintiffs are barred from relitigating the issues central to these claims by the principle of collateral estoppel. We affirm its dismissal of plaintiffs' RICO claim because plaintiffs failed to allege a "pattern of racketeering activity" within the meaning of RICO.
 
 I.
 
 9
 Plaintiffs' securities law claims revolve around two "schemes" allegedly committed by defendants. First, plaintiffs allege that defendants depressed the price of the trust's Southland holdings through a "price scheme" by which the defendants made misrepresentations to and concealed information from the company's appraisers. Plaintiffs also contend that defendants reduced the value of the trust's holdings through a "voting control scheme," by which Leonard fraudulently increased his holdings in Southland to 55% by causing the company to issue to him 185 additional shares in 1984. Because the questions central to the plaintiffs' securities law claims have been decided in the Florida action, the district court was correct in holding the plaintiffs collaterally estopped by relitigating those issues.
 
 
 10
 The Florida state court approved the sale of the trust's stock at the price set by the Arthur Young appraisal. Plaintiffs now seek, through their claims regarding the "price scheme," an opportunity to relitigate the value of the trust's stock in order to show that its value is greater than the value set by the Florida court. They argue that such an opportunity is warranted because critical information was withheld from the state court. As the Seventh Circuit held in Harris Trust and Savings Bank v. Ellis, 801 F.2d 700, 703 (7th Cir.1987), however, "[t]hat some facts may have been withheld from the state court is not a federal reason to disregard the state's decision."
 
 
 11
 Harris involved a set of facts similar to that before us. After a series of state court proceedings had resulted in the valuation and sale of certain stock held by a trust, the trustee brought a Sec. 10(b) suit in federal court, alleging that a party to the earlier actions had made inadequate and fraudulent disclosures in connection with the state valuation proceedings. The Harris court held that [I]f the securities laws overrode state principles of finality, the losing side in the appraisal could walk into federal court and try again, with the refrain that the winner in state court had defrauded the judge by not being forthcoming about which was the better estimate of value. The securities laws do not allow such a displacement of state valuation proceedings into federal court.
 
 
 12
 Id. at 704. The plaintiffs in this case are likewise barred from bringing their complaint regarding the "price scheme" to federal court. They have had an opportunity to litigate the value of the trust's Southland stock, and are barred from relitigating that issue here.
 
 
 13
 Plaintiffs contend, however, that they were denied an opportunity to litigate the value of the trust's stock because the defendants withheld and concealed from the state court critical information regarding Southland's value. Federal courts are bound to give to state judgments the same preclusive effect they would have in the courts of the state where they are rendered. Migra v. Warren City School District Board of Education, 465 U.S. 75, 81 (1984). While fraud is a reason to set aside a judgment under Florida law, relief from fraud in a case such as this must be pursued in the same proceeding in which the questioned judgment was entered. Vandervoort v. Vandervoort, 529 F.2d 424, 425-26 (5th Cir.1976). Any alleged withholding or concealment from the state court does not constitute a federal reason to disregard the preclusive effect of the Florida decision; the plaintiffs' remedy lies in recourse to state procedures. See Harris Trust, supra, 810 F.2d at 703, 705-06.
 
 
 14
 The state judgment also precludes the plaintiffs from relitigating their claims with respect to the "voting control scheme." Plaintiffs argue that the issues in controversy here are not identical to those in the Florida suit, and that the doctrine of collateral estoppel therefore does not apply. They argue that the Florida court considered evidence only of the fact that the shares were issued and that they lowered the trust's holdings to 45% of the outstanding Southland stock, and did not consider Leonard's "improper motives and means of issuing the shares."
 
 
 15
 In June, 1984, however, plaintiffs filed in the Florida action "Objections" to Southland's issuance of 185 shares to Leonard. They alleged that Leonard had "attempted to water down the stock, and dilute it and change the status quo." At its June 7, 1985 hearing, the Florida court heard evidence regarding the dilution in the value of the trust's holdings which resulted from the sale of 185 shares to Leonard. John Parker, who performed the Arthur Young appraisals, testified that he discounted the value of the trust's holdings because of its "minority aspect" and "lack of marketability."
 
 
 16
 The issues raised in the Florida suit with respect to the "voting control scheme" are the same issues sought to be raised here. The plaintiffs may not relitigate them by recharacterizing that "scheme" as a violation of federal securities law.* See Harrison v. Bloomfield Building Industries, Inc., 435 F.2d 1192, 1195-96 (6th Cir.1970).
 
 II.
 
 17
 The district court dismissed the plaintiffs' RICO claim. We affirm because the plaintiffs' complaint fails to allege a "pattern of racketeering activity" within the meaning of RICO.
 
 
 18
 To violate RICO, one must engage in a "pattern of racketeering activity," which RICO defines to require at least two acts of such activity. Plaintiffs contend that the acts of securities fraud alleged in their complaint constituted racketeering activity under 18 U.S.C. Sec. 1961(1)(D), and that together they formed a pattern of racketeering activity within the meaning of 18 U.S.C. Sec. 1961(5).
 
 
 19
 While RICO defines a "pattern of racketeering activity" to require "at least two acts of racketeering activity," 18 U.S.C. 1961(5) (emphasis added), it is clear that two such acts do not necessarily meet the definition. Rather, the existence of a "pattern" depends on context, HMK Corp. v. Walsey, 828 F.2d 1071, 1074 (4th Cir.1987), and we must consider the "criminal dimension and degree" of the conduct complained of in determining whether that conduct constitutes a "pattern of racketeering activity." International Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 155 (4th Cir.1987). "[T]he heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine." HMK, 828 F.2d at 1074.
 
 
 20
 A "single, limited fraudulent scheme" will not support a RICO claim unless the racketeering acts "are committed in a manner characterizing the defendant as a person who regularly commits such crimes." Zepkin, 812 F.2d at 154-55 (quoting Lipin Enterprises, Inc. v. Lee, 803 F.2d 322, 324 (7th Cir.1986). See also Lipin, 803 F.2d at 324 ("[t]here must be some indication of a 'threat of continuing activity' by the defendants, not just one instance of fraud with a single victim"). The fraudulent schemes alleged by the plaintiffs form a single fraudulent scheme with a single victim. There is no indication of a threat of continuing criminal activity, nor is there any indication that the schemes have any unusual scope or persistence. Even if the plaintiffs' allegations were proven true, the imposition of the enhanced penalties of RICO would not be justified. The district court was correct in finding no "pattern of racketeering activity" and in dismissing the RICO claim.
 
 III.
 
 21
 There must, at some point, be an end to litigation. Plaintiffs have had an opportunity to contest every facet of the trust's sale of its Southland stock, and have availed themselves of that opportunity. They chose to raise their claims in Florida and may not relitigate the issues raised there by merely recasting them in terms of federal law. Artful pleading does not vitiate the doctrines of preclusion.
 
 
 22
 The judgment of the district court is therefore
 
 
 23
 AFFIRMED.
 
 
 
 *
 Neither plaintiffs nor the trust bought or sold stock in connection with the issuance of 185 Southland shares to Leonard in 1984, and plaintiffs would clearly lack standing to pursue a Sec. 10(b) claim based solely on that transaction. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749 (1975). Plaintiffs seek to avoid this result by arguing that the fraudulent scheme allegedly pursued by defendants in connection with that transaction formed part of a larger scheme to violate Sec. 10(b) in connection with the sale of the trust's 825 shares of Southland. The trust was the seller of stock in that transaction, and while the trust is not a plaintiff here, the plaintiffs contend that they have standing as beneficiaries of the trust to pursue the Sec. 10(b) claim. The district court held that they lacked standing. In view of our decision on the application of the doctrine of collateral estoppel, we need not address that issue