**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1880**

WHITNEY, BRADLEY & BROWN, INC.,

Plaintiff – Appellant,

v.

CHRISTIAN L. KAMMERMANN,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Claude M. Hilton, Senior
District Judge. (1:09-cv-00596-CMH-IDD)

Argued: May 10, 2011                    Decided: June 23, 2011

Before NIEMEYER, KING, and KEENAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Michael Nicholas Petkovich, JACKSON LEWIS, LLP, Reston,
Virginia, for Appellant. David Philip Korteling, CAPLAN,
BUCKNER, KOSTECKA & KORTELING, CHARTERED, Bethesda, Maryland,
for Appellee. **ON BRIEF:** Kara Ariail, Amanda Vaccaro, JACKSON
LEWIS, LLP, Reston, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff Whitney, Bradley & Brown, Inc. ("WBB"), appeals from the district court's award of summary judgment to the defendant, Christian L. Kammermann, on the basis of the court's conclusion that Kammermann had not contravened 18 U.S.C. § 1962(c) (the "civil RICO statute"). See Whitney, Bradley & Brown, Inc. v. Kammermann, No. 1:09-cv-00596, Memorandum Opinion (E.D. Va. July 7, 2010) (the "Opinion").[1] More specifically, the Opinion rejected WBB's civil RICO claim because WBB was unable to show that Kammermann engaged in a pattern of racketeering activity. As explained below, we affirm.

I.

A.

The civil RICO statute, which underlies the RICO tort claim at issue here, provides, in pertinent part, that it is illegal

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

---

[1] The Opinion is found at J.A. 238-54. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

18 U.S.C. § 1962(c).  The Supreme Court has explained that a civil RICO claim has four essential elements:  (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).  Only the third element — proof of a pattern (hereinafter the "Pattern Element") — is relevant here.  In order to prove the Pattern Element, a RICO plaintiff must show "a relationship between the predicate[] [acts and] the threat of continuing activity."  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) (internal quotation marks omitted).  The continuity-of-activity requirement of the Pattern Element has been described as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id. at 241.

As alluded to by the Supreme Court in H.J., the alternatives for establishing the continuity of activity essential to the Pattern Element are typically referred to as "open-ended" and "closed-ended" patterns.  The Court has recognized that, in order to show an open-ended pattern for purposes of a civil RICO claim, a plaintiff is obliged to demonstrate the continuity of the racketeering activities by presenting evidence of conduct "that by its nature projects into the future with a threat of repetition."  H.J., 492 U.S. at 241.

3

On the other hand, in order to show a closed-ended racketeering pattern, a multi-factor test must be satisfied, and a careful assessment must be made of "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir. 1986); see HMK Corp. v. Walsey, 828 F.2d 1071, 1073 (4th Cir. 1987).

B.

WBB is a federal government contractor, headquartered in Reston, Virginia, that facilitates business relationships between private enterprise and the Department of Defense. WBB continuously employed Kammermann as a manager from May 2004 until January 2009. In May 2006, unbeknownst to WBB, Kammermann formed and also began working for a business entity called CLK Executive Decisions, LLC ("CLK"), which provided services nearly identical to those performed by WBB. In January 2009, WBB terminated Kammermann's employment upon learning of his conflicting involvement in and ownership of CLK.

On March 29, 2010, WBB filed the operative complaint in this case, that is, its Second Amended Complaint (the

4

"Complaint"), in the Eastern District of Virginia.[2] The Complaint alleges that Kammermann, while employed by WBB, engaged in a scheme that encompassed two types of fraudulent activities: (1) the weekly transmission of false time entry reports to WBB; plus (2) the submission of duplicative expense reports to WBB and clients of CLK for the same activities.[3] According to the Complaint, Kammermann transmitted weekly time entry reports to WBB documenting that he was working for WBB when he was actually working for CLK. The Complaint also specifies fourteen instances of duplicate billing that occurred in the nine-month period between March and December 2008:

- On March 18, 2008, Kammermann billed $300 to WBB for expenses he also billed to Electrovaya;

- Between March 31 and December 18, 2008, Kammermann submitted nine separate billings, totalling approximately $9300, to WBB for expenses he also billed to Schiebel;

- On August 26 and September 3, 2008, Kammermann submitted two billings, totalling approximately $1800, to WBB for expenses he also billed to Security First;

---

[2] The Complaint is found at J.A. 14-42. The original version thereof was filed in the district court on May 27, 2009.

[3] The five CLK clients involved in the double-billing aspect of Kammermann's fraud scheme are Schiebel Technology, Inc. ("Schiebel"), Electrovaya Company ("Electrovaya"), Security First Corporation ("Security First"), Recon Robotics, Inc. ("Recon Robotics"), and Free Wave Technologies, Inc. ("Free Wave").

- On October 28, 2008, Kammermann billed $1,637 to WBB for expenses he also billed to Schiebel and Free Wave; and

- On November 12, 2008, Kammermann billed $973 to WBB for expenses he also billed to Free Wave and Recon Robotics.

The Complaint alleges six separate tort claims. Only one of those claims, the civil RICO claim alleged in Count I, is relevant to this appeal.[4]

In the civil RICO claim, WBB alleges, inter alia, that Kammermann

> [f]rom at least March 2008 and continuing through December 2008 . . . unlawfully, knowingly, and intentionally conducted and participated, directly and indirectly, in the conduct, management, and operation of CLK . . . through a pattern of racketeering activity consisting of numerous acts . . . indictable under 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

---

[4] The Complaint's other five claims each arise under Virginia law: Breach of Fiduciary Duty/Duty of Loyalty (Count II); Actual Fraud: Hours Worked (Count III); Actual Fraud: Expense Reimbursements (Count IV); Constructive Fraud: Hours Worked (Count V), and Constructive Fraud: Expense Reimbursements (Count VI). Upon granting summary judgment to Kammermann on Count I, the district court declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice. See 28 U.S.C. § 1367(c). The district court's discretionary dismissal was initially identified as an issue on appeal, but WBB has since withdrawn that challenge from our consideration. We take scant pleasure in our affirmance today of the district court's award of summary judgment to Kammermann, who has sought our succor notwithstanding his apparent misdeeds. We note, however, that he could yet be held accountable through an appropriate civil action in the courts of the Commonwealth.

6

Complaint ¶ 99. The alleged predicate offenses of mail and wire fraud underlying the civil RICO claim were Kammermann's submissions to WBB, through an overnight delivery service and email transmissions, of the false time entry and expense reports.

## C.

On June 2, 2010, defendant Kammermann moved for summary judgment on the RICO claim, submitting a stipulation that spelled out more than 100 facts he deemed pertinent. Relying on the stipulation, Kammermann contended that WBB could not, for lack of the essential continuity of activity, establish the RICO claim's Pattern Element. According to Kammermann, neither an open-ended nor a closed-ended pattern had been proved. Kammermann argued that an open-ended pattern was not apparent because there was no evidence that his fraudulent activities had continued beyond December 2008. Kammermann maintained that his scheme was not closed-ended either, because his fraudulent acts — however despicable — were, even when viewed in the light most favorable to WBB, merely an ordinary commercial fraud scheme that failed to rise to the level of a RICO violation.

On June 14, 2010, plaintiff WBB responded to Kammermann's summary judgment motion, supporting its opposition primarily with three items of evidence: (1) the affidavit of Ana R. Richey, WBB's Vice-President of Administration, explaining that

7

WBB's "Employee Stock Ownership Plan (ESOP)" makes WBB a wholly employee-owned company and that there were more than 150 ESOP participants; (2) a stipulation of over 200 assertedly pertinent facts detailing Kammermann's employment history and relationship with WBB, including his submission of various expense reports and time entry reports (reporting hours worked) to WBB;[5] and (3) an excerpt from Kammermann's deposition in this case. WBB emphasized that its position was supported by our unpublished decision in Professionals, Inc. v. Berry, No. 91-1509, 1992 WL 64796 (4th Cir. Apr. 2, 1992) (affirming civil RICO liability where predicate acts arose from commercial fraud scheme). WBB also contended that Kammermann was incorrect on the number of predicate acts, in that the fraud scheme actually involved more than 150 such acts (including duplicate billings and false time entry reports), the scheme in fact continued for nearly three years (beginning shortly after Kammermann formed CLK in 2006 and continuing until his termination from WBB in 2009), and there were vastly more than the six victims acknowledged by Kammermann (namely, WBB's more than 150 ESOP participants).

---

[5] The stipulation filed with WBB's response was somewhat more comprehensive than the stipulation filed with Kammermann's summary judgment motion. However, none of the stipulated facts appear to contradict one another.

D.

On July 7, 2010, the district court issued its Opinion, ruling that, because WBB was unable to satisfy the continuity-of-activity requirement of the Pattern Element, Kammermann was entitled to summary judgment on the civil RICO claim. Significantly, the court recognized that the only fraudulent activity supported by the record was the submission of duplicative expense reports to WBB and clients of CLK on fourteen occasions between March and December 2008. The court characterized WBB's allegations of an open-ended pattern as "pro forma," concluding that no such pattern existed absent evidence that Kammermann's fraudulent activities continued after December 2008. Opinion 9. The court also agreed with Kammermann that a closed-ended pattern had not been shown, explaining that only "fourteen predicate acts over a twelve month period is insufficient to make out a case for RICO." Id. at 14. In so ruling, the district court emphasized that (1) we have been reluctant to find civil RICO liability where the only predicate acts are mail and wire fraud offenses; (2) the only participants in the fraud scheme were Kammermann and CLK; (3) the only victims of the scheme were WBB and the five clients of CLK; (4) the scheme was limited to "misrepresentations made in order to obtain expense reimbursements from WBB"; and (5) the Complaint and evidence failed to show any distinct injuries. Id. at 16.

9

WBB filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment. See S.C. Green Party v. S.C. State Election Comm'n, 612 F.3d 752, 755 (4th Cir. 2010). In so doing, we view the underlying facts and the permissible inferences drawn therefrom in the light most favorable to the non-moving party. See In Re French, 499 F.3d 345, 352 (4th Cir. 2007).

## III.

In pursuing this appeal, WBB contends that there are genuine disputes of material fact that preclude an award of summary judgment. Furthermore, WBB urges, the relevant evidence, when viewed in the proper light, compels the conclusion that Kammermann contravened the civil RICO statute because the facts of this case parallel those presented in Professionals, Inc. v. Berry, where we affirmed a finding of civil RICO liability. See No. 91-1509, 1992 WL 64796 (4th Cir. Apr. 2, 1992). As explained below, both of these contentions are without merit.

10

A.

WBB maintains that the district court erred in failing to recognize three genuine disputes of material fact. More specifically, WBB contends that Kammermann's fraud scheme involved more than 150 predicate acts, continued for nearly three years, and had more than 150 victims. WBB's assertions of disputed fact, however, are not supported by the evidentiary record, and therefore are not genuine.

First, WBB maintains that, in addition to the duplicate billings to WBB and CLK's clients, Kammermann submitted false expense reports and weekly time entry reports to WBB from 2006 until 2009. The record, however, discloses no evidence of wrongdoing beyond the duplicate billing recognized by the district court in its Opinion. Thus, the court did not erroneously determine — viewing the evidence most favorably to WBB — that only fourteen predicate acts were shown as part of Kammermann's fraud scheme.[6]

Second, WBB asserts that Kammermann's fraud scheme continued for nearly three years, beginning when he formed CLK in 2006 and continuing until his termination from WBB in 2009.

_____

[6] If Kammermann's transmission of expense reports to CLK's clients are also deemed to be predicate acts for the purposes of our civil RICO analysis, the number of such acts would increase from fourteen to about thirty. Such an increase would not, however, have any bearing on our analysis.

The evidence, however, fails to support this assertion, establishing only the duplicate billing scheme that occurred in the nine-month period between March and December 2008.

Finally, WBB entreaties us to conclude that there were more than 150 victims of Kammermann's fraud scheme, mainly by adding WBB's ESOP participants. Unfortunately for WBB, however, it is "[a] basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities." Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003). Thus, "[p]eople dealing with a corporation are obliged to look to the corporation for satisfaction of their claims. Only in extraordinary circumstances are directors liable for corporate debts." Flip Mortg. Corp. v. McElhone, 841 F.2d 531, 534 (4th Cir. 1988). As a corollary, a corporate entity is generally treated as a single victim for purposes of civil RICO liability. Accordingly, the district court correctly recognized that there were, at most, six victims of Kammermann's fraud scheme — WBB and the five clients of CLK.

B.

At bottom, WBB is left to rely solely on our Berry decision. Unfortunately for WBB, however, that decision is neither controlling nor apposite. First, the Berry decision bears no precedential weight. See Local Rule 32.1; Pressly v. Tupperware Long Term Disability Plan, 553 F.3d 334, 338 (4th

12

Cir. 2009) (recognizing that unpublished decisions are not binding in this Court). Second, the <u>Berry</u> decision is readily distinguishable on its facts, and therefore not on point. That case involved a real estate company (Professionals), a family (the Berrys), and another business that the Berrys formed and operated (Berry Associates). In 1985, the Berrys solicited investments for two plots of land, which they titled to Berry Associates. Professionals later contracted with Berry Associates to develop the land in exchange for part of any profits.

During the following three years, the Berrys diverted approximately $500,000 from Professionals. In so doing, they, inter alia, (1) caused Professionals to pay salaries to Berry family members who were performing no services; (2) fraudulently purchased and resold land; (3) wrote checks to themselves to cover unsubstantiated expenses; (4) directed their accountant to falsely indicate that a loan from Professionals had been repaid; (5) made false entries in check records on which their accountant relied; and (6) filed misleading financial reports. Additionally, the Berrys opened bank accounts for sham construction companies that had failed to maintain business records, pay taxes, or register under state law. Nevertheless, the Berrys fraudulently charged Professionals in excess of $325,000 for services never performed by the construction

13

companies. As a result, Professionals pursued a civil RICO claim against the Berrys and Berry Associates. After conducting a bench trial, the district court ruled in favor of Professionals, rendering a plaintiff's judgment on the RICO claim.

On appeal to this Court, the Berrys contended that the RICO claim's predicate acts failed to constitute a pattern of racketeering activity. We disagreed, however, and affirmed the district court's judgment for the plaintiff. For our purposes today, two observations are pertinent. First, although the Berrys used mail and wire transfers and communications, they did so in a variety of ways — by "solicitation of initial and multiple subsequent fiscal contributions, preparation and furnishing of false and misleading financial reports, and participation in shareholders' meetings during which the Berrys disseminated false and misleading reports on the progress of the sites." Berry, 1992 WL 64796, at *3. The extensive and varied manner in which the Berrys used mail and wire transfers is an important distinction from this case, where Kammermann used mail and wire transfers solely to file his false expense reports. Second, in Berry there were fifty-eight fraudulent acts over a three-year period that victimized sixteen investors and involved three individual schemes and participants.

14

As our unpublished decision in <u>Berry</u> emphasized, "[t]he acts encompassed a variety of techniques to deplete corporate assets and support the Berrys' method of operating the corporation, including falsified invoices and creation of fictitious subcontractors." 1992 WL 64796, at \*3. These facts stand in contrast to the ordinary commercial fraud cases where we have been consistently reluctant to approve use of the civil RICO statute, such as where "one perpetrator undertook actions directed toward a single fraudulent goal that impacted two investors over a period of approximately one year" — a set of facts much more analogous to those presented here. <u>Id.</u> (citing <u>Menasco, Inc. v. Wasserman</u>, 886 F.2d 681, 684 (4th Cir. 1989)). As we have emphasized, "[i]f the pattern requirement [of the civil RICO statute] has any force whatsoever, it is to prevent . . . ordinary commercial fraud from being transformed into a federal RICO claim." <u>Menasco</u>, 886 F.2d at 685. Moreover, "we are cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." <u>GE Inv. Private Placement Partners v. Parker</u>, 247 F.3d 543, 549 (4th Cir. 2001) (internal quotation marks omitted).

As the district court explained in its Opinion, there was no showing of the continuity-of-activity aspect of the Pattern Element. Kammermann's fraudulent activities actually ceased by

15

December 2008, foreclosing the possibility of an open-ended pattern. On the closed-ended pattern question, the record circumscribes the predicate acts, and, as the court properly recognized, those acts are insufficient to form the basis for such a scheme. Put simply, this dispute exemplifies the situation of a RICO plaintiff who seeks to transform an ordinary commercial fraud scheme into a RICO claim, something we are loath to approve. In such circumstances, we are satisfied to affirm the award of summary judgment to Kammermann.

IV.

Pursuant to the foregoing, we reject WBB's appellate contentions and affirm the summary judgment award.

AFFIRMED

16